CITY OF ST. LOUIS, Respondent, v. ST. LOUIS GAS-LIGHT COMPANY, Appellant.

**April 16, 1878.**

1. A contract by which a corporation binds itself not to exercise certain fran_ chises committed to it by the State for public purposes is *ultra vires* and void, and cannot be set up as a defence in an action to compel specific performance of an obligation imposed by law upon such corporation.

2. By act of 1837, and acts amendatory, commonly called the charter of the St. Louis Gas-Light Company, the General Assembly of Missouri gave to that company the exclusive right of manufacturing and selling illuminating gas in the city of St. Louis and its suburbs; subject, however, to the provision that after twenty years, fixed as the absolute duration of the charter, the city should have the right, optionally to be exercised

by the city or not, in 1860 or 1865, of purchasing the gas-works and appurtenances from the company. The General Assembly, in the charter, particularly describe certain formal acts of notice and resolution, and provide that, if the city shall resolve to purchase the gas-works, the price shall be fixed by arbitrators, one or more of whom must be appointed by the gas company; while, in case the city does not resolve to purchase at either of the times provided, the company's charter is to be in force until 1890. In 1846, nine years after the passage of this charter, a contract was made between the city and the gas company, providing that the city should relinquish its right to purchase the works in 1860, and that in case the city should not exercise its privilege in 1865, then the city might purchase in 1870, and at periods of five years thereafter. Notwithstanding this contract, the city, in 1860, took the formal steps prescribed by the Assembly as the acts which should be considered a determination on the city's part to purchase the works. The gas company then refused to sell, on the ground that by the contract of 1846 the city had surrendered its right to buy in 1860. In 1870, the city again took the prescribed steps; the gas company then refused to appoint arbitrators or to sell, on the ground that the charter times of purchase had expired. *Held*, in an action for specific performance, instituted by the city in 1870, that if the contract of 1846 is void as *ultra vires* of the parties, it does not follow that the city cannot recover in this proceeding; that, without reference to the doctrine of estoppel, whether the provisions in the charter as to time were mandatory or not, the gas company, in view of the facts in this case, could not urge that they were so; that, as by insisting on the contract of 1846 the gas company had prolonged its enjoyment of the franchise and property for ten years, it was estopped to deny the validity of that contract in so far as it provided a different time when the purchase might be made; that payment was not a condition precedent; that the city held the purchase-money as trustee for the gas company, and the company held the gas-works in trust for the equitable owner, the city, while the franchise, resumed by the State, passed to the city; and that the city, having performed all preliminaries on its part, was entitled to specific performance.

3. In 1873, the city, the gas company, and another gas company, called the Laclede Company, entered into a tripartite agreement which was embodied in a city ordinance, by which it was agreed that, on certain conditions, this suit was to be dismissed; that the territory should be divided between the gas companies; and that the contract of 1846 should be cancelled. *Held*, that this contract was in violation of the company's charter, and against the policy of the law; that the company's franchises and the gas-works had, prior to 1873, passed to the State and become vested in the city for a public purpose, and the city could not part with them under the guise of dismissing a suit; that, as the contract was made after the suit was brought, and the company had notice of the want of authority in the city officers to make it, the city was not estopped from contending that it was *ultra vires;* and that, on the facts, the court below properly charged the gas company with profits of the business from 1870, and refused to allow interest to be credited thereon.

APPEAL from St. Louis Circuit Court.

*Affirmed.*

GLOVER & SHEPLEY, for appellant : The contract of 1846 is *ultra vires*, and void.  *Abbott* v. *Rubber Co.*, 33 Barb. 583 ; *Bedford R. Co.* v. *Bowser*, 48 Pa. St. 37 ; *Black* v. *Canal Co.*, 9 C. E. Green, 467 ; *Collins* v. *Clay*, 33 Me. 132 ; *Ward* v. *Insurance Co.*, 7 Paige, 294 ; *Zabriskie* v. *Railroad Co.*, 3 C. E. Green, 183.  Resting upon *contract* alone, the city of St. Louis, if the St. Louis Gas-Light Company refused to appoint arbitrators, could not maintain a bill to have arbitrators or referees or masters appointed by the court to value the gas-works of the St. Louis Gas-Light Company. — *King* v. *Howard*, 27 Mo. 25 ; *Biddle* v. *Ramsey*, 52 Mo. 153 ; *Hug* v. *Burklee*, 58 Mo. 203 ; *Milner* v. *Gery*, 14 Ves. jr. 400 ; *Blundell* v. *Brettagh*, 17 Ves. 243 ; *Gourlay* v. *The Duke of Somerset*, 19 Ves. 431 ; *Agar* v. *Maclew*, 11 Sim. & St. 418 ; *Street* v. *Rigby*, 6 Ves. 815 ; *Tobey* v. *The County of Bristol*, 3 Story, 820 ; *Vickers* v. *Vickers*, L. R. 4 Eq. 529 ; *Richardson* v. *Smith*, L. R. 5 Ch. App. 648 ; *Darly* v. *Whittaker*, 4 Drury, 134 ; *Willis* v. *Davis*, 3 Metc. 507.  The city had full power to surrender or release to the St. Louis Gas-Light Company all its proprietary right and interest in and claim to the gas-works and property. — 2 Dill. on Mun. Corp., sec. 445 ; *Bailey* v. *Mayor, etc.*, 3 Hill, 531.  The city had the authority to compromise with the gas company, and to cause the suit against the company to be dismissed. —1 Dill. on Mun. Corp. 488, note 2 ; *Bean* v. *Jay*, 23 Me. 121 ; *Petersburg* v. *Mappin*, 14 Ill. 193 ; *The People* v. *Supervisors*, 27 Cal. 681 ; *Supervisors* v. *Bowen*, 4 Lans. 33 ; *Meech* v. *Buffalo*, 29 N. Y. 198.  The city is estopped from setting up any invalidity in the contract of 1873, or asserting any claim upon the gas-works. — *St. Louis Gas-Light Co.* v. *City of St. Louis*, 46 Mo. 132 ; *The State* v. *Gas-Light Co.*, 29 Wis. 454 ; *Binghamton Bridge Case,* 3 Wall. 51 ; *Slaughter-House Cases*, 16 Wall. 66 ; Herman on Estop.,

sec. 541; *Hale* v. *Insurance Co.*, 32 N. H. 295; *Zabriskie* v. *Railway Co.*, 23 How. 400. The contract of 1873 is not *ultra vires* in any of its provisions, either as to the city or as to the gas-light companies. — 2 Dill. on Mun. Corp., sec. 547; *Gas Co.* v. *San Francisco*, 9 Cal. 468. It was error to charge the gas company with profits from 1870. — Fry on Spec. Perf., sec. 889; *Currie* v. *White*, 45 N. Y. 831; *Westmacott* v. *Robins*, 4 De G. & J. 390; *Wall* v. *Bright*, 1 Jac. & W. 500.

NOBLE & ORRICK, for appellant: The time of purchase allowed by the charter could not be extended by agreement. — *Dalton* v. *Murphy*, 30 Miss. 59; *Head* v. *Insurance Co.*, 2 Cranch, 168; *Thames, etc. Co.* v. *Lathrop*, 7 Conn. 554; *Williamsport* v. *Kent*, 14 Ind. 308. An agreement containing provisions to fix price by arbitration cannot be specifically enforced. — *Biddle* v. *Ramsey*, 52 Mo. 153; *Hug* v. *Burklee*, 58 Mo. 203; *Milner* v. *Gery*, 14 Ves. 400; *Blundell* v. *Brettagh*, 17 Ves. 243; *Gourlay* v. *Duke of Somerset*, 19 Ves. 431; *Agar* v. *Maclew*, 11 Sim. & St. 418; *Tobey* v. *The County of Bristol*, 3 Story, 820. The contract of 1846 is *ultra vires* and void. —*Abbott* v. *Rubber Co.*, 33 Barb. 578; *Colman* v. *Railway Co.*, 4 Eng. Rail. Cas. 513. The city had no power to purchase in 1870. —*U. S. F. S.* v. *Philadelphia*, 31 Pa. St. 175.; *Ruggles* v. *Collier*, 43 Mo. 375; *Head* v. *Insurance Co.*, 2 Cranch, 168; *Farmers', etc., Co.* v. *Carroll*, 5 Barb. 49; *The State* v. *Bank*, 45 Mo. 538. Until the city paid for the gas it consumed under the contract of 1846, it had no right to demand a transfer of the gas-works to it by virtue of the same contract. — *Doyle* v. *Teas*, 4 Scam. 365; *Runkle* v. *Johnson*, 30 Ill. 328; *Bates* v. *Wheeler*, 1 Scam. 54; *Cassidy* v. *Metcalf*, 1 Mo. App. 601; *Tibbs* v. *Morris*, 44 Barb. 138. Laches. — *Hough* v. *Coughlan*, 41 Ill. 130; Fry on Spec. Perf. 218. The contract of 1873 was not *ultra vires*. —*The State ex rel.* v. *Miller*, 1 Mo. App. 68; *Bailey* v. *Mayor*, etc., 3 Hill, 539; *Newark* v. *Elliott*, 5 Ohio; *Reynolds* v.

*Commissioners*, 5 Ohio, 204. Want of corporate power cannot be asserted collaterally. — *Chambers* v. *St. Louis*, 29 Mo. 577; 11 Serg. & R. 418; 3 Rand. 136; 7 Serg. & R. 319; 4 Johns. Ch. 370. The city is estopped to deny the validity of the contract of 1873. — *Zabriskie* v. *Railway Co.*, 23 How. 381; *Randolph* v. *Post*, 95 U. S. 513; *Argenti* v. *San Francisco*, 16 Cal. 225; *Moran* v. *Commissioners*, 2 Black, 723; *Palmer* v. *Birmingham*, 3 Sandf. 162; *Steam Nav. Co.* v. *Weed*, 17 Barb. 378; *Chester Glass Co.* v. *Dewey*, 16 Mass. 94; *McCutcheon* v. *Steamboat Co.*, 13 Pa. 13; *Potter* v. *Bank*, 5 Hill, 490; *Suydam* v. *Banking Co.*, 5 Hill, 491; *Sackett's Harbor Bank* v. *Bank*, 11 Barb. 213.

WAGNER, DYER & EMMONS, for appellant: Where there is a defect of capacity in the corporation, the power cannot be created by an express agreement. — *Houldsworth* v. *Evans*, L. R. 3 H. L. 263; 9 Jur. (N. S.) 631; 11 C. B. 775. — Corporations have only such powers as are specially given by their charters, or are necessary to carry into effect some specified power. — *St. Louis* v. *Russell*, 9 Mo. 507; *Blair* v. *Insurance Co.*, 10 Mo. 559; *Ruggles* v. *Collier*, 43 Mo. 353; *Matthews* v. *Skinker*, 62 Mo. 329; *Railroad Co.* v. *Marion County*, 36 Mo. 303; *Fowler* v. *Scully*, 72 Pa. St. 456; 92 U. S. 122; *Head* v. *Insurance Co.*, 2 Cranch, 127; 12 Wheat. 64; 8 Ch. App. 152. There was no estoppel on the part of the company, and the plea of *ultra vires* is conclusive. — *Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62; *Packet Co.* v. *Shaw*, 37 Wis. 655; *Railroad Co.* v. *Railroad Co.*, 7 Wis. 59; 1 Dill. on Mun. Corp., sec. 387. The agreement of 1873 is a valid and binding agreement, authorized by the chartered powers of the parties thereto. — *Beach* v. *Haynes*, 12 Vt. 15; *Bailey* v. *Mayor, etc.*, 3 Hill, 531; *Hannon* v. *St. Louis*, 62 Mo. 313; 31 Pa. St. 175; *Broughton* v. *Pensacola*, 93 U. S. 269; 93 U. S. 502; *Chambers* v. *St. Louis*, 29 Mo. 577. Courts will not entertain an action to compel specific performance of an

agreement to refer to arbitrators. — 52 Mo. 153 ; 58 Mo. 203 ; 14 Ves. 400 ; 17 Ves. 243 ; 19 Ves. 431 ; 3 Story, 820 ; 2 Sim. & St. The court had no power to appoint a receiver. — *Union Trust Co.* v. *Railroad Co.*, 4 Cent. L. J. 585. The court erred in its decree in respect to its allowance to the company, and in charging it with rents and profits. — *Brewer* v. *Herbert*, 30 Md. 301 ; *White* v. *Howard*, 46 N. Y. 162 ; *Worrall* v. *Munn*, 38 N. Y. 137 ; *Wall* v. *Bright*, 1 Jac. & W. 474 ; *Dana* v. *Petersham*, 107 Mass. 602.

H. A. CLOVER, for respondent : The contract of 1873 was *ultra vires* and void. — *Wheeler* v. *Philadelphia*, 77 Pa. St. 388 ; *Pablo Salo* v. *New Orleans*, 2 Woods, 188 ; 31 Pa. St. 175 ; 13 Serg. & R. 230 ; 9 Watts & S. 27 ; *Winch* v. *Railroad Co.*, 5 De G. & Sm. 562 ; 13 Eng. Law & Eq. 508 ; *Black* v. *Railroad Co.*, 24 N. J. — ; 9 C. E. Green, 455 ; *Hays* v. *Railroad Co.*, 61 Ill. 422 ; *Copeland* v. *Gas-Light Co.*, 61 Barb. 76 ; 45 Cal. 365 ; *The People* v. *Railroad Co.*, 24 N. Y. 261 ; 37 Barb. 217 ; *Thompson* v. *The People*, 23 Wend. 584. The St. Louis Gas-Light Company could not, by yielding a part of its territory to the Laclede Company, neglect its corporate duty, and suspend its business in such territory. — *Abbott* v. *Rubber Co.*, 20 How. Pr. 199 ; 21 How. Pr. 193 ; *Conro* v. *Iron Co.*, 12 Barb. 27 ; *Beman* v. *Ruffard*, 1 Sim. (N. S.) 550 ; 6 Eng. Law & Eq. 106 ; *Johnson* v. *Railway Co.*, 3 De G. M. & G. 914 ; *Shrewsbury, etc., R. Co.* v. *Railway Co.*, 6 H. L. Cas. 131 ; 1 Sim. 110 ; *Railway Co.* v. *Railway Co.*, De G. M. & G. 576 ; *Railway Co.* v. *Railway Co.*, 9 Hare, 306 ; *Troy, etc., R. Co.* v. *Kerr*, 17 Barb. 601 ; *Railroad Co.* v. *Railroad Co.*, 14 Am. L. Reg. 733 (Vol. 5, N. S.) ; *Lamman* v. *Railroad Co.*, 6 Casey, 42 ; *Railroad Co.* v. *Winans*, 17 How. 39 ; *The Commonwealth* v. *Smith*, 10 Allen, 455 ; *Richards* v. *Libby*, 11 Allen, 66 ; *Zabriskie* v. *Railroad Co.*, 3 C. E. Green, 183 ; *McGregor* v. *Official Managers, etc.*, 16 El. B. & E.

180. The city can compel specific performance of the obligations imposed by the provisions of the company's charter. — *Gas Co.* v. *Wheeling*, 5 W. Va. 320. The court committed no error in charging the company with rents and profits. — *Phillips* v. *Silvester*, 42 L. J. (Ch.) 225 ; *Davy* v. *Barber*, 2 Atk. 490 ; *Paine* v. *Miller*, 6 Ves. 347 ; *Benton* v. *Todd*, 1 Swan, 225.

HENDERSON •& SHIELDS, for respondent : The matter of time when the purchase might be made, in the original charter, was not of the essence of the contract ; and even if it was, it was waived. — 1 Story's Eq. Jur., sec. 776 ; *Falls* v. *Carpenter*, 1 Dev. & B. 237 ; *Estel* v. *Railroad Co.*, 56 Mo. 282 ; *Melton* v. *Smith*, 65 Mo. 315 ; *Brownfield* v. *Palmer*, 7 Blackf. 227 ; *Ewing* v. *Crouse*, 6 Ind. 312 ; *Keller* v. *Fisher*, 7 Ind.' 718 ; *Jones* v. *Robbins*, 29 Me. 351 ; *St. Louis* v. *Sparks*, 10 Mo. 117 ; *State ex rel.* v. *Churchill*, 41 Mo. 41 ; *State ex rel.* v. *County Court*, 41 Mo. 247 ; 3 Comst. 197 ; 18 Barb. 583. The contract of 1846 was valid. — *McCullough* v. *Moss*, 5 Denio, 567 ; *Fleckner* v. *Bank*, 8 Wheat. 338 ; Green's Brice's Ult. Vir. 78–90, 386, note ; 390, 391, note. Where there is excuse for delay, mere lapse of time will not bar an action for specific performance. — *Coulson* v. *Walton*, 9 Pet. 62 ; *Logan* v. *McCord*, 2 A. K. Marsh. 224 ; *Craig* v. *Leeper*, 2 Yerg. 193 ; *Kelly* v. *Hunt*, 61 Mo. 463 ; *Williston* v. *Williston*, 41 Barb. 635 ; *Huffman* v. *Hummer*, 17 N. J. Eq. 263 ; *Steele* v. *Branch*, 40 Cal. 3 ; *Gas Co.* v. *Wheeling*, 8 W. Va. 320. The city acquired the right, by virtue of its compliance with the charter provisions and the contract of 1846, to purchase the franchises and works of the gas company. — *Gas Co.* v. *Wheeling*, 8 W. Va. 320 ; *Attorney-General* v. *Eau Claire*, 37 Wis. 400 ; *Mayor* v. *Ray*, 19 Wall. 468 ; *Hitchcock* v. *St. Louis*, 49 Mo. 484 ; *Darlington* v. *New York*, 31 N. Y. 164 ; *Wheeler* v. *Philadelphia*, 77 Pa. St. 338. And can specifically enforce that right. — *Kelso* v. *Kelly*, 1 Daly, 420 ; *Johnson* v. *Conger*, 14 Abb. (U. S.)

195; *Arnot* v. *Alexander*, 44 Mo. 25; *Strohmaier* v. *Zeppenfeld*, 3 Mo. App. 429. The tripartite agreement of 1873 is void. — *The People* v. *Railroad Co.*, —— —— 261; *Shepherd* v. *Gas Co.*, 6 Wis. 539; *Hays* v. *Railroad Co.*, 61 Ill. 422; *Railroad Co.* v. *Williams*, 17 How. 39; 3 Johns. 27; 45 Cal. 365; Green's Brice's Ult. Vir. 71, 305, 372; *Cheeney* v. *Brookfield*, 60 Mo. 53; *St. Louis Canal Co.* v. *St. Louis*, 3 Dill. 91, note; 19 Wall. 468. Estoppel. — *State Board* v. *Railroad Co.*, 47 Ind. 407; *Bradley* v. *Bullard*, 55 Ill. 417; 17 N. Y. 453; 40 N. H. 230; *Schreen* v. *Seymour*, 24 N. J. Eq. 154.

LEVERETT BELL, for respondent: The tripartite contract and ordinance of 1873 is invalid, and void. — *French* v. *Woodward*, 58 Mo. 66; *Gas Co.* v. *Gas Co.*, 25 Conn. 19; 16 Wall. 36; *Hitchcock* v. *St. Louis*, 49 Mo. 484; *Pierce* v. *Emery*, 32 N. H. 486; *Black* v. *Railroad Co.*, 22 N. J. Eq. 399; 10 Allen, 448; 11 Allen, 65. Whether the contract of 1846 is *ultra vires* and void, the gas company is estopped to assert that it is so. — 46 Mo. 121; Cooley's Const. Lim. 47. There was no error in the decree in this case. — *Oliver* v. *Cromwell*, 42 Ill. 41; *Haughwaut* v. *Murphy*, 7 C. E. Green, 119; *Kerr* v. *Day*, 14 Pa. St. 112; *Haughwaut* v. *Murphy*, 7 C. E. Green, 546; 1 Sugden on Vend. 270; 2 White & Tudor Ld. Cas. (pt. 2) 1057; *Davis* v. *Parker*, 14 Allen, 94; 1 Bibb, 586; 24 N. J. Eq. 298. The contract of 1873 cannot be maintained against the city by way of estoppel. — Dill. on Mun. Corp., secs. 381, 749. A case is made here for a decree of specific performance. — *Arnot* v. *Alexander*, 44 Mo. 25; *Strohmaier* v. *Zeppenfeld*, 3 Mo. App. 429; *Tscheider* v. *Biddle*, 4 Cent. L. J. 323; *Biddle* v. *Ramsey*, 52 Mo. 153.

W. B. THOMPSON, for respondent: The section of the company's charter relating to the time when the city might purchase is directory; time is not of the essence of the contract, and was waived by the contract of 1846. — *Wood* v.

*Griffith,* 1 Swan, 56; *Morse* v. *Merest,* 6 Madd. Ch. 25; *The People* v. *Cook,* 14 Barb. 290; *Price* v. *Woodford,* 43 Mo. 23. The company, having acted under the contract of 1846, is estopped to deny its validity. — *Zabriskie* v. *Railroad Co.,* 23 How. 381; *Rumsey* v. *The People,* 19 N. Y. 41; *The People* v. *Maynard,* 15 Mich. 470. The city, having taken all the steps required, became entitled to purchase the company's franchises and works. — *Railroad* v. *Regina,* 4 Eng. Law & Eq. 276; *Ex parte Jennings,* 6 Cow. 329; *The People* v. *Hayden,* 6 Hill, 359; *Jackson* v. *Reynolds,* 14 Johns. 335. The obligation of the contract of 1846 consists in the power and efficacy of the law which applies to it, and it may be specifically enforced. — *Ogden* v. *Saunders,* 12 Wheat. 259; *Paris* v. *Haley,* 61 Mo. 453; *Colson* v. *Thompson,* 2 Wheat. 336; *Kendall* v. *Almy,* 2 Sumn. 278; *Biddle* v. *Ramsey,* 58 Mo. 203; *Stephens's Hospital* v. *Dyas,* 15 Irish Ch. 505; *Jackson* v. *Jackson,* 1 Sm. & G. 184; *Lumley* v. *Wagner,* 5 De G. & Sm. 485; *Milner* v. *Gery,* 14 Ves. jr. 407; *Farrar* v. *Patton,* 20 Mo. 84. The tripartite contract of 1873 is *ultra vires* and void. — *Gas Co.* v. *Gas Co.,* 25 Conn. 19; *The State* v. *Gas Co.,* 18 Ohio (N. S.) 262; 20 Mich. 452; 21 Pa. St. 22; *Bradley* v. *Railroad Co.,* 21 Conn. 306; *Holdsdom* v. *Copeland,* 16 Me. 304; *Cox* v. *Lamson,* 16 Mo. 224; *Shepard* v. *Gas Co.,* 6 Wis. 539; *Gas Co.* v. *Mayor,* 1 Nev. 320; *Rollins* v. *Clay,* 33 Me. 132; 15 Wis. 313; 46 Mo. 121; *Mayor* v. *Cunliff,* 2 Comst. 165; *Cuyler* v. *Trustees,* 12 Wend. 165; *Vincent* v. *Nantucket,* 12 Cush. 105; *Parsons* v. *Goshen,* 11 Pick. 396. Being *ultra vires* and void, it could not be ratified by any act done under it. — *Martin* v. *Zollerback,* 38 Cal. 300; *Clark* v. *Des Moines,* 19 Iowa, 209. The city is not estopped to deny its validity. — *St. Louis* v. *Gorman,* 29 Mo. 593; *Rossire* v. *Boston,* 4 Allen, 53; *McFarland* v. *Kerr,* 10 Bosw. 249; *Coates* v. *Major,* 7 Conn. 585; *Kincaid's Appeal,* 66 Pa. St. 411; *Morgan* v. *Smith,* 4 Minn. 104.

HAYDEN, J., delivered the opinion of the court.

This is a petition, in the nature of a bill in equity, to enforce specific performance of an obligation alleged to rest upon the appellant to convey to the respondent certain gasworks and property connected with them, which are the subject of the controversy. The original petition was filed against the appellant alone; afterwards an amended petition was filed, making the Laclede Gas-Light Company also a defendant, but as to the latter company the suit was subsequently dismissed. The right of respondent arises from acts of the General Assembly of the State of Missouri, which incorporated the appellant, and at the same time gave to the respondent the right to purchase these gas-works under certain conditions. In the original act, entitled "An act to incorporate the St. Louis Gas-Light Company," it is recited that sundry citizens of St. Louis have contracted with that city for lighting its streets with gas, and have subscribed shares to form a joint-stock company to erect gasworks for the purpose of lighting the city and its suburbs; that, as the General Assembly consider these objects a benefit to the city and the public, therefore they grant the charter. Provisions of the charter, besides the ordinary clauses, are that the company shall never charge more than one cent for every cubic foot of gas, nor charge the city more than the company shall be getting at the same time from the majority of the inhabitants using gas; that the company shall be entitled to the sole and exclusive privilege of vending gaslights and gas-fittings in the city of St. Louis and its suburbs, to such persons as may voluntarily choose to contract for the same; and shall have the power to lay pipes in the streets, etc.; to manufacture lime and gas-fittings, and sell coal, lime, and stone; to construct a railway from their quarries to their works, etc. Certain powers of insurance are given to the company, but it is forbidden to do a banking business. The act provides that it shall be the duty of the company to prosecute the works necessary for

lighting the whole city of St. Louis and suburbs with gas, and to lay their pipes in every and all directions, whenever the board of directors shall be satisfied that the expenses thereon shall be counterbalanced by the income arising from the sales of gas; that when, by resolution of the Board of Aldermen, it shall be ordered that lamps be erected and lighted in the streets of the city, the company shall make contracts therefor, and, at their expense, provide street-posts, lamps, etc., the city paying an interest of eight per cent per annum on the amount of the cost of such street-lamps, etc. The company is not bound to lay pipes in places where the proceeds from the sale of gas are not sufficient to defray the expenses of furnishing it. Acts 1836-7, p. 173.

By the amended act of Feb. 11, 1839, the city and the directors of the appellant " may contract for and make regulations relating to the lighting of said city with gas, in such manner as may be agreed upon ; and they may make, generally, such contracts in relation to the business of the company as may be beneficial to them and the public." By this act, the date 1838 is changed to 1840; the city is empowered to subscribe for stock in the company, and three years are given to the appellant, notwithstanding its charter may expire, in which to close up its business. The clauses as to the duration of the company's charter and the city's privilege of purchase are given below. Sess. Acts 1838-9, p. 242; Sess. Acts 1845, p. 150.

In the year 1841, a contract was entered into between the company and the city in regard to providing and keeping lighted public lamps. For failure to erect lamps and keep them burning, in certain cases, penalties were provided. Under this contract the respondent claimed that certain penalties accrued to it which were discharged by the contract of 1846. From its claims on this account the respondent, in 1845, agreed to release the appellant, if the appellant would offer a new contract containing such terms as the

mayor and Common Council would agree to.  This resulted in the contract of Jan. 9, 1846, between the city and directors of the appellant.  It appears that the stockholders of the appellant did not assent to this contract, and this non-assent is one ground of objection to it by the appellant in the present case.  The more material provisions of the agreement are given *verbatim* below.  For the rest, it is sufficient to say that by it the respondent, under the provisions of the twenty-sixth section of appellant's charter, contracts with the appellant for the erection of certain lamps in a limited district of the city.  Various provisions as to the kind of public lamps, and for new lamps in the future, are made.  A price is agreed upon for the gas to be consumed by the public lamps ; times are fixed for the erection of lamps, under penalties.  It is provided that the appellant shall not charge more than one-half of the price to private consumers contemplated in the seventh section of its charter ; that the appellant shall surrender the exclusive privilege of vending gas-fittings in the city and suburbs. Under this contract, which superseded that of 1841, both parties continued to act until the close of the year 1869.

By act of March 2, 1857, and acts amendatory of it, which it is not essential to closely construe in this case, the Laclede Gas-Light Company was incorporated, and it was provided that that company should, within that part of the corporate limits of the city of St. Louis not embraced within the corporate limits of the city as established by a certain act of the Legislature of date Feb. 8, 1839, have, during the time specified, the privilege and right of lighting such parts of the city, and of making and vending gas, gas-lights, etc. ; that the company might contract with the city as to lighting such parts, etc.  By act of March 26, 1868, it is provided that the Laclede Company may, " within the corporate limits of the city of St. Louis, as the same now are or hereafter may be established," exercise the rights granted to it by the fifth section of the act to which it is

amendatory. The third section provides that nothing in this act shall be construed to affect the vested rights of the appellant.

On March 12, 1859, the General Assembly passed "An act to enable the city of St. Louis to purchase the gas-works of the St. Louis Gas-Light Company." The first section of this act provides that, in order to enable the city to purchase and pay for the works, according to the twenty-seventh section of the charter of the appellant, the mayor of St. Louis is empowered to issue bonds, as described, which are to be special gas-bonds, which shall be obligatory on the city, and a special lien on the works and franchises, etc. The second section provides that if the city shall not purchase the gas-works in 1860, as provided in the first section, the act shall remain in force, so as to enable the city to purchase the gas-works at any other time when, by the amended charter, the purchase is authorized to be made. This section then says: "And upon said purchase being made, at any time," all the rights and property, etc., shall be the property of the city. By act of Feb. 5, 1864, it is provided that it shall be lawful for the city, at any time after the Common Council shall decide to purchase the gas-works, to issue bonds, etc. The recital of this act is to the effect that it is provided in the charter of the appellant that the city has the privilege of purchasing the works in twenty-five years from Jan. 1, 1840, by the City Council giving to the company six months' notice prior to Jan. 1, 1865, etc.

On June 28, 1859, the Common Council of the respondent passed a resolution declaring that it was expedient for the city to purchase the gas-works from the appellant, as provided by sec. 27 of the amended charter of the appellant; and, on the next day, the mayor gave to the appellant notice of the passage of this resolution, stating that it was the intention and design of the city, at the expiration of twenty years from Jan. 1, 1840, to purchase the gas-works

from the appellant, as provided in the charter and amendment. On July 24, 1860, the Common Council passed an ordinance which, after reciting the previous proceedings, appointed five arbitrators on the part of the city, and empowered them to act in conjunction with a like number on the part of the appellant in fixing the price of the gas-works, etc., as provided by the charter. The ordinance also provided for the issue of bonds of the city to pay for the gas-works, upon the rendering of the final award by the arbitrators, and for the payment of the price to the appellant through the means of these bonds. On July 26, 1860, the mayor of the city notified the appellant of the passage of this ordinance and of the appointment of the arbitrators, and requested the appellant to appoint arbitrators on its part. On October 25, 1860, the appellant replied, stating that its directors had considered the proposal of the city to purchase, and declined it, and had requested their president to so notify the mayor. This letter gave no reason for the appellant's refusal to proceed according to the charter ; but, from an annual. report of the directors of the appellant, it appeared that the reason for the refusal was that the respondent, by the contract of 1846, had relinquished the right to purchase the gas-works in 1860. The appellant refused to appoint arbitrators, and those of the city were forced to adjourn without action.

The appellant thus having placed itself upon the basis of the contract of 1846, the city took no further proceedings. Both parties acted for many years under the contract of 1846, and the common attitude was that the contract fixed their mutual rights and obligations, so far as concerned the purchase of the works by the city. In 1865, the second period of choice fixed by the charter, the city passed no resolution of purchase, but allowed the time to elapse. In 1869–70, notice was given, and a resolution duly passed, as provided by the charter. These proceedings need not be particularly described, as they correspond to those of 1859–

60, which have already been recited. The proceedings of 1869–70 being taken, and the appellant requested to appoint arbitrators, in order that the city might purchase the gas-works, the appellant again refused to sell the works or to make the appointment. At this time the appellant placed its refusal on the ground that its board of directors had no power to make the contract of 1846, so far as it related to the sale of the gas-works to the city, and that the right of the city to purchase expired on the first day of January, 1865. This refusal was given early in December, 1869. On May 21, 1870, the present suit was brought.

The evidence shows that the city had been backward in its payment of dues to the appellant, and that about this time, or in 1870, the city owed some $400,000 to the appellant; that the city was in doubt as to its rights under the charter and contract of 1846 ; that conferences were had, and that there were negotiations for a settlement of the matters in dispute between the appellant and the city, being chiefly those which afterwards formed subjects of the provisions of the tripartite contract. The tripartite contract was executed on Feb. 28, 1873, by the city of the first part, the Laclede Gas-Light Company of the second part, and the appellant of the third part. Shortly before its execution, the appellant had conveyed to the Laclede Company, for the recited consideration of $700,000, " all its mains, pipes, etc., and all other of its property and effects, north of the south line of Washington Avenue, in St. Louis. The material parts of the tripartite ordinance and contract are as follows : —

The ordinance is entitled, " An ordinance to provide for the better lighting of St. Louis with gas ; for a reduction in the price of gas ; for the settlement of litigation between the city and the St. Louis Gas-Light Company ; to provide for the establishment of an additional gas company in the city, and for controlling the quality and standard of gas and gas-lights by the city," etc. It enacts that a contract is

authorized and directed to be made between the three parties, and the ordinance then sets out the contract in full. It is first provided that the appellant waives, abandons, and surrenders forever to the city, irrevocably, any and all claim, and pretence of claim, of exclusive right to have gas-works, lay or have pipes or other appliances, vend or furnish gas, or do business as a gas company in a certain district or portion of the city, being that part north of the south line of Washington Avenue; then, that the appellant will not, in such district, assert any right to hinder or prevent any gas-works being erected or completed, any pipes being laid, or gas being furnished to the city or its inhabitants, by any gas company or private persons; and specific provisions are added to carry out the purpose thus expressed. The second section is as follows : —

" The Laclede Gas-Light Company and the St. Louis Gas-Light Company, each and both of them, further covenant and agree with the city of St. Louis, that each one of said companies shall act only under its own charter and franchises ; that each shall have its own property, and manage and prosecute its own separate business under its own charter and franchises ; but the Laclede Gas-Light Company abandons and surrenders, fully and completely, any and all exclusive right of lighting any part of the city of St. Louis with gas, or making or vending gas, gas-lights, or gas-fixtures, and all sole or exclusive right whatsoever, whether claimed under its charter or by the aforesaid surrender to it, or otherwise, such surrenders and abandonments by both companies to be done and effected in legal and binding manner ; it being hereby understood and agreed, that the district and portion of the said city which is to be occupied by the Laclede Gas-Light Company, and for and within which it herein contracts to furnish gas, and do other things herein contracted for by it, is and shall be the district aforesaid, all north of said line above described ; and that the district and portion of said city which is to be occupied by the St.

Louis Gas-Light Company, and for and within which it herein contracts to furnish gas, and to do all other things herein contracted for by it, is and shall be the remainder or balance of said city, so far as the charter of said St. Louis Gas-Light Company extends and authorizes."

The third and fourth sections of the contract contain various provisions in regard to a city inspector of gas and gas-meters, whose salary is, by this agreement, to be paid by the companies; in regard to a certain standard according to which gas, in future, is to be furnished, not only to the city, but to its inhabitants and private consumers; in regard to a certain price for gas, which is not to be exceeded; to laying additional mains and pipes, upon the order of the city, by the two companies; and to the erection of such lamps as the city may desire, at all places where the mains are laid. Provisions are then made for the public lamps, each of the two companies contracting as to the keeping in good repair and supply of the lamps within its own district, at a price agreed upon. It is then provided that the contract shall continue in force until Jan. 1, 1890; that the litigation between the city and the appellant shall cease, and that "all suits pending between them are to be dismissed, and all causes of action between them to be considered as settled." Provisions are made for extending the time of payment of the debt owing by the city to the appellant. Then follows the following clause: "And this contract and agreement is a substitute for and in lieu of said contract of date Jan. 9, 1846, between the city and the St. Louis Gas-Light Company; and which last-named contract is to be cancelled by the parties thereto, and each and both parties to be absolved therefrom." Then follows the second section of the ordinance, providing that both companies shall signify their acceptance of the contract, and for its then being executed by the mayor in behalf of the city, and by the officers of the two companies.

This agreement was authorized by the stockholders of the

appellant, all the shareholders signing it except the city, which owned two hundred shares of the stock, and also by the stockholders of the Laclede Company. After the execution of the tripartite contract, various measures were taken by the city according to and upon the basis of its provisions. An ordinance was passed providing for an inspector of gas, whose salary, under the contract, was paid by the two companies to the city. The appellant introduced evidence tending to show that, after the execution of the tripartite contract, there was a considerable reduction in the price, and improvement in the quality, of the gas furnished; that many ordinances were passed, according to the tripartite contract and ordinance, for laying new gas-mains in many streets, for public lamps, etc., and that these were executed by the appellant under the orders of the city. It appeared that the city, as stockholder in the appellant company, received $10,000, its share of the sum paid by the Laclede Company to the appellant as the consideration for the transfer made by the appellant to the Laclede Company. The appellant also dismissed the suits which were pending against the city, and extended the time for the payment of all the city's indebtedness.

The court below, upon the basis of the proceedings of 1869–70, as set out in the petition, decreed specific performance as of Jan. 1, 1870, according to the charter and the contract of 1846; declared that respondent was entitled to purchase the works at the date named; that the tripartite contract could not deprive respondent of its rights; that by the refusal of the appellant to appoint arbitrators, and thus have the value of the property fixed, a trust was created, and that since Jan. 1, 1870, the appellant had held the property as trustee for the respondent; decreed that the appellant should account for all revenues which had been realized, or which might have been realized, from the use of the property and management of the business in the manufacture and sale of gas after Jan. 1, 1870. Commis-

sioners were accordingly appointed to take proofs, under specific instructions, as to value and profits, and to report specially or apply for further directions.

By this interlocutory decree, the appellant was forever enjoined from manufacturing or selling gas in St. Louis or its suburbs ; a receiver was appointed of the gas-works and the property appurtenant, with specific instructions as to his action ; and orders were made to enable him to properly discharge his duties. The commissioners took evidence which fills some three hundred closely printed pages, and made a detailed report, upon the facts of which the court below based its final decree. By this decree, the court below adjudged that the different matters in controversy between the appellant and respondent be adjusted on the basis of charging the appellant with the total receipts in the operation of the gas-works from Jan. 1, 1870, to June 5, 1876, when the receiver took possession of the works, and also with the money received from the Laclede Company, amounting in all to $6,076,360.35, and with this amount the appellant was charged. Against this sum were allowed to the appellant credits, first, for the value of the gas-works and appurtenances upon Jan. 1, 1870, with five per cent added ; then, for the total expenditures of the appellant in and about the business from Jan. 1, 1870, to June 5, 1876 ; then, for the value of coal and gas on hand ; and then, for various items, allowed with a view of adjusting all matters between the city and appellant ; these credits amounting in all to $6,027,310.60. The decree directs that the latter amount, thus found to be due to appellant, be paid by deducting the same from the total with which the appellant is charged ; that the respondent have judgment for the balance ; and that the title to the works and appurtenances be vested in the respondent. The case is here by appeal.

To arrive at a correct solution of the important questions involved in this case, it is essential at the outset to consider

very carefully the act of Feb. 4, 1837, and especially secs. 27, 28, and 31 of that act.  It is one of the principal points of the appellant that the contract of 1846, so far as the sections hereafter set out are concerned, is void.  It will not, therefore, be inappropriate to consider, *first*, what are the respective rights of the appellant and respondent under the act just named, and its amendments, without reference to the contract of 1846 ; *secondly*, to consider the rights of the parties as affected by the contract of 1846 ; and, *lastly*, to consider the tripartite contract of Feb. 28, 1873, and the question of its validity.

The principal act is spoken of as the charter of the appellant, but it has other aspects than such as belong to a charter, and these are material to the present case.  It is a law, an expression of that will which, acting within its sphere, is the sovereign power of the State.  The rights and obligations of three parties are involved : those of the State, of the St. Louis Gas-Light Company, and of that municipal corporation to which the State, for the good of a portion of its people, has delegated a part of its sovereign power.  The rights of no creditors, or persons asserting claims against the city, are involved.  It is with the appellant, the creature of the act, and with the respondent, that the common creator of the two is dealing.  To that creator both owe that obedience which the law recognizes as due to the sovereign from those who are subject to its commands.

One main feature of the act and its amendments is the intent, expressed in them in different ways, to benefit the respondent.  The General Assembly begin by reciting its opinion that the lighting of the streets of the city of St. Louis with gas, the erection of works for supplying the city and its suburbs with the necessary apparatus for lighting them, is a benefit to the city, and conducive to the public good.  Therefore the Legislature proceed to grant extraordinary franchises and privileges to the appellant.  These are the more extraordinary as th·y are exclusive.  They

constitute what, except under certain restrictions, the law considers and condemns as a monopoly. The exclusive privileges thus granted are not in terms confined even to the city of St. Louis, but the words, " and its suburbs," are also added. The company, in order to carry the powers expressly granted into effect, is " authorized to lay pipes, conduits, or rails, at the expense of the company, in any of the roads or avenues of the suburbs, as well as in the streets and alleys of the city." Sec. 24 of the Charter ; *St. Louis Gas-Light Co*. v. *City of St. Louis*, 46 Mo. 121. The Legislature has plainly signified that it has not granted these extraordinary privileges, except with a view to the public benefit. The elements which render valid many grants of exclusive privileges, and which take from the grants that character as a monopoly which the law condemns, are to be found in considerations moving to the public. *Slaughter-House Cases*, 16 Wall. 36, opinion of the court, 65, 66 ; *The Binghamton Bridge*, 3 Wall. 51, 73, *et seq.; Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 545, 549 ; *Shepard* v. *Milwaukee Gas Co.*, 6 Wis. 547 ; *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 637. The franchises thus granted belong to the people in their sovereign capacity. If, in return for the grant, the people, or such portions as may be selected by the State, — as, for instance, the inhabitants of the district for which the franchise is granted, — receive and enjoy a corresponding benefit, the grant may lose its character as a monopoly. But the acts by which such exclusive powers are given are to be strictly construed against the grantee, and liberally construed in favor of the public. The grantee will be held to a careful compliance with the terms of the grant, where the rights of the people are involved. Privileges secured to the public are presumed to have been of the essence of the consideration of the grant. " It would present a singular spectacle," said Chief Justice Taney, delivering the opinion of the Supreme Court of the United States in the *Charles*

*River Bridge* case (*supra*), "if, while the courts in England are restraining within the strictest limits the spirit of monopoly, and exclusive privileges in nature of monopolies, and confining corporations to the privileges plainly given them in their charter, the courts of this country should be found enlarging their privileges by implication, and construing a statute more unfavorably to the public and to the rights of the community than would be done in a like case in an English court of justice." The chief justice then proceeds to cite and consider authorities to the effect that the terms of the grant are to be strictly construed against the corporation, and that nothing passes from the public by implication.  11 Pet. 545, 546.

Here the Legislature was willing to confer exclusive franchises, but only on condition of a corresponding benefit to an important section of the State.  Rights were given to the city, corresponding to the franchises bestowed upon the appellant.  In favor of the respondent, the absolute existence of the appellant as a corporation is limited to twenty years from Jan. 1, 1838 (1840, by amendment).  It is with the respondent to say, in the manner prescribed, whether the appellant shall have a longer duration.  On the face of the charter, and apart from matters outside of it, there is nothing which secures to the appellant any further term of life.  Its existence beyond the twenty years is purely conditional.  The sections are as follows : —

" Sec. 27. That, if after the expiration of twenty years from and after the first day of January, 1838, the corporation of the city of St. Louis should resolve to purchase the said gas-works from the St. Louis Gas-Light Company, which they hereby shall have a right to do, the price shall be fixed by arbitrators, one or more to be chosen by the president and directors of the company, and an equal number by the Board of Aldermen of said city ; said arbitrators shall not be stockholders in said company, nor members of said Board of Aldermen.  They shall take into consider-

ation the value of the gas-works, and the lands, grounds, buildings, utensils, rights, and interests, and every thing thereunto appertaining, and if they agree, and so report in writing, their award shall be binding on the parties ; but if they should not agree, then the said arbitrators shall elect some creditable and disinterested person as umpire between them, whose decision and award, in writing, reported to the parties above, shall be binding and conclusive, any law to the contrary notwithstanding. To the amount so agreed upon shall be added seven per centum advance on said valuation, which amount, with the seven per centum on the same, shall be paid by the corporation of the said city to the said company, in full consideration for their works, lands, grounds, buildings, interests, rights, and utensils, etc., belonging to the said gas-works.

" Sec. 28. That in the event the said city shall decline to purchase at the end of twenty years, as provided in the preceding section, then the company shall, in like manner, at the end of twenty-five years from and after the first day of January, 1838, and provided the Board of Aldermen then resolve to purchase the same, sell and convey to the city all their estates, interests, and titles to the said gas-works, in manner as is before provided in section 27, except that to the amount of valuation then so to be agreed upon shall be added only five per centum advance, which amount, with the said five per cent on the same, shall be paid by the city to the company, in full of all consideration for the said gas-works and their appurtenances. *Provided*, however, that the corporation of the city of St. Louis shall notify the president and directors of the company of their intention to purchase, at either of the times prescribed, at least six months previous to the expiration of the said terms of twenty years and twenty-five years respectively ; and a failure to notify as herein provided shall be deemed a refusal on the part of the city to purchase the interest of the said company."

" Sec. 31. This act shall take effect from and after its passage, and shall be in force for the term of twenty-five years from and after the first day of January, in the year of our Lord one thousand eight hundred and thirty-eight, unless the company hereby incorporated shall sell and convey, within the said term of twenty-five years, their gas-works, lands, rights, and privileges, as herein provided, to the city of St. Louis; in which event said gas-works, and all rights, powers, and privileges hereby granted, shall be vested in the mayor, aldermen, and citizens of St. Louis, in their corporate capacity, and this charter shall cease and determine. But should the said city not resolve to purchase at either of the times as provided herein, then this act shall be in full force for an additional term of twenty-five years from and after this last date mentioned for such sale and purchase."

It is the legislative power of the State which speaks in these words; and in prescribing what is to be done by the respondent, it speaks in reference, not to a private person, but to a municipal corporation, governed by a legislative body. The words are: "If   *   *   *   the corporation of the city of St. Louis should resolve to purchase the said gas-works,   *   *   *   the price shall be fixed by arbitrators," etc. By sec. 28 it is provided, " that in the event," etc, " the company shall," etc., " provided the Board of Aldermen then resolve to purchase the same, sell and convey to the city," etc. In the last words of the twenty-eighth section the Legislature provide what particular act or omission shall be a refusal to buy the works : " and a failure to notify as herein provided will be deemed a refusal on the part of the city to purchase the interests of said company." So, the last words of sec. 31 provide that, " should the said city not resolve to purchase at either of the times as provided herein, then this act shall be in full force," etc.

These peculiar expressions, thus recurring, indicate plainly the legislative intent. It is not said, " If the said corpora-

tion shall purchase the gas-works, the price shall be fixed,'' etc. Nor is it said, '' But should the said city not complete the purchase of the gas-works at either of the times,'' etc. No construction of these sections can be a correct one which confounds the expressions which the Legislature has used with expressions similar to those supposed. It is a main feature of these sections that in them the General Assembly have not merely provided for the purchase, leaving the details to the respondent and appellant, but have provided what particular steps shall be taken. These provisions are as much a part of the legislative will as any other part of the act, and can no more be disregarded. Moreover, the motive and reason of these provisions is apparent. It was desirable, not only that the judgment of the city authorities should be exercised, and respondent's valuable option secured to it, but that there should be some formal act marking acceptance and fixing the rights of the respondent. So careful were the General Assembly upon this point, that they provided, not only what affirmative act should signify acceptance, but what negative act should indicate refusal. If the '' corporation of the city resolve to purchase,'' the next step, the fixing of the price by arbitrators, is to take place, and so on with the subsequent steps; while '' a failure to notify '' is to be '' deemed a refusal.'' A charter is granted to the appellant for twenty years; at the end of that time, by the terms of the act, certain legislative rights accrue to the city. Corporators and stockholders who accept the charter take it subject to these rights. At the end of twenty years certain things are to be done, or not to be done, according to a legislative scheme, and the act itself prescribes what shall be the consequence of doing and of the omission to do these acts.

If the respondent gives notice as required by the act, and the resolution of purchase is duly passed as provided for, an obligation on the part of the appellant immediately springs up. The respondent has the right to purchase, and

the same clause of the law which declares the right, declares how it shall be exercised. Except upon the supposition that the appellant may not only violate its contract, but defeat the legislative will, the appellant must proceed to appoint arbitrators. The mandate of the Legislature is addressed directly to the appellant; and unless the step commanded is performed, it is impossible that either the contract shall be executed, or the design of the State be carried out. The Legislature could anticipate nothing but obedience, as this was the duty of appellant; and, accordingly, sec. 27 proceeds to provide that the arbitrators shall take into consideration the value of the gas-works, etc., and what shall be done in case of agreement, what in case of disagreement. Every thing leading up to the result is provided for on the supposition that the steps as prescribed will be observed by the parties.

So, sec. 31, by its language, shows that the Legislature anticipated that the appellant would perform its contract and exactly obey the law. The act is to be in force for twenty-five years, etc., "unless the company hereby incorporated shall sell and convey, within the said term of twenty-five years, their gas-works," etc., "to the city of St. Louis; in which event said gas-works, and all rights, powers, and privileges hereby granted, shall be vested in the mayor," etc., "and this charter shall cease and determine." As a matter of course, the General Assembly did not intend to provide that the appellant should have a five years' additional term of life as a reward for violating its contract and the law. If the appellant refused to appoint arbitrators, when bound to do so under sec. 27, it was liable to be immediately proceeded against. It could not, by its wrongful act, renew its life. The words just quoted from sec. 31 presume that the company will "sell and convey" when the law requires, and will take all necessary steps to that end. By sec. 28, the appellant is required to "sell and convey to the city," "provided the Board of Aldermen then *resolve* to pur-

chase," etc. By the words of sec. 31, which immediately succeed those above quoted, "should the said city *not resolve to purchase*," etc., *then* the act is to be extended for twenty-five years. Thus the anticipation of the Legislature, as shown by every section, is that a sale and conveyance of the works will follow the notice and resolution; while, on the other hand, in case there should be no sale and conveyance, it would, as a matter of course, be because the city had failed to notify and resolve.

The scheme of the General Assembly was not only to be carried out; it was to be carried out in the manner prescribed by the General Assembly. A leading inducement for their grant of the charter is the carefully contrived plan, elaborated in successive sections with a minuteness unusual in legislative acts, by which, for public purposes, the city of St. Louis might become possessed of the gas-works. If the notice was given and the resolution passed as prescribed in the scheme, the legal consequences followed as a matter of course. The appellant could legally no more refuse to appoint arbitrators than it could refuse to sell and convey after every preliminary had been accomplished. It had enjoyed for twenty years the franchise which had belonged to the people of the State, on the express condition that it should, among other things, appoint arbitrators when called upon so to do in the manner prescribed by the act. It was subject to legislative commands in matters of detail, as in other matters, and here the matter of detail was of such a character that to defeat that part of the plan was to defeat the whole scheme of the General Assembly. Even the sovereign State cannot violate the obligation of the contract; it would be strange indeed if the party with whom that sovereign State has contracted could with impunity, as against that State and its grantee, not only violate an express provision of the contract, but build up a superstructure of rights on the basis of such violation.

Taking the act of Feb. 4, 1837, by itself, it is impos-

sible not to notice the comparative prominence given to those matters which relate to the election of the city, and to fixing the price of the works, over the matter of payment.   In sec. 27 it is merely said that the amount as ascertained "shall be paid by the corporation of the said city," etc. ; and similar words are used in sec. 28.   No scheme for raising money is devised, nor means of payment provided.   It was not, of course, anticipated that the sum, necessarily large, would be paid in cash ; and, from the nature of the case, time would be required to raise it. The appellant, by its refusal to appoint arbitrators, and by its denial of the right of the respondent to buy, never allowed the case to reach the point where any question could arise as to payment.   It never, when appealed to, admitted the right of the city to buy the works, and never refused to convey on the ground that the city had no means of payment.   But it is to be observed that the charter was accepted by corporators and stockholders in view of the fact that no especial means are provided by the act, and that further legislation would be essential, in all probability, to enable the respondent to raise the necessary money.   In point of fact, the act of March 12, 1859, makes full provision for raising funds to enable the respondent to pay for the works.

In allowing the respondent to purchase these gas-works ; in bestowing upon the city, in case it formally resolved to buy them, the franchise which had previously been exercised by the appellant, the General Assembly had in view, as the acts show, the good of the city and the welfare of its citizens.   Beyond this it is not possible to know, nor is it material to inquire, the particular motives which induced the Legislature to give to this municipal corporation the power to hold this property and to manufacture illuminating gas.   That the manufacture of this article bears the same relation to the political functions of such a corporation which is borne by the manufacture, for instance, of leather

or cloth, is a proposition wholly untenable. The illuminating qualities of the substance make it peculiar. It is not merely that it is an article of general use, and has become indispensable in large cities; its peculiar qualities bring it into direct connection with the functions of government which the State intrusts to municipal corporations. Owing to the habits of modern life, a large part of the business and intercourse of those living in cities is carried on after dark. To adequately protect persons and property during the hours of the night, artificial light is absolutely essential, and there must be abundance of it, and facility in its use. Thus possessed, it is one of the most efficient aids of the police power. Observation shows that the ratio of crime regularly diminishes in large towns as they are well and generally lighted at night; and all recent experience confirms the connection, expressed in passages which have long been memorable in our language, by which light is associated with order, and darkness, in cities, with injury and outrage. It was for the Legislature to say whether, owing to these and other considerations of public interest, they would bestow upon the respondent the power to hold gas-works, and manufacture and sell illuminating gas. To give such powers to municipal corporations may be unwise, but it is not for the courts to supplement or correct the political measures of the Legislature; or, when they have said otherwise, to say that the powers thus given are not a part of the public powers. The nature and manner of the grant sufficiently indicate their opinion. If the powers and property have obvious public uses; if the connection between them and the governmental functions of a municipal corporation is direct, the fact that such powers and property may be regarded from other points of view, and may have additional uses, affords no reason why the courts should attempt to make that private property which the Legislature has placed in the same class with the public buildings, the sewers, and the parks of a city. The line which divides

those powers which merely protect life and property, from those which, in a larger sense, govern by promoting well-being, is incapable of exact definition, and varies with time and place.   Then, too, the means of regulation and control, in the absence of constitutional restrictions, must be within the power of the Legislature.   A municipal corporation might, by a general contract, procure many of its police functions to be done.   Whether it shall accomplish its purposes by contracts with individuals, or through franchises and property of its own, is a matter of political and administrative government.

It may be advisable that a city should have gas-works for its public uses exclusively; or the Legislature, designing to give a city the power to manufacture gas and hold gas-works, may annex the power to sell, as incidental, and as a means of sustaining the public works.   A policy proper for one city, or at one time, may be wholly unsuitable for another city, or at another time.   The grant of such powers constitutes no contract.   The parties are public parties, the interests public interests; the power is given by the State for governmental purposes, and the right is implied to alter, adapt, or withdraw.   This is the distinction between such grants and those which are contracts.   *East Hartford* v. *Hartford Bridge Co.*, 10 How. 511; *City of New Orleans* v. *Hoyle*, 23 La. An. 740; *The State, etc.*, v. *Railroad Co.*, 12 Gill & J. 438; *s. c.*, 3 How. 534.   Except so far as concerns the rights of third persons, such powers are subject to the legislative will.   *Police Jury* v. *Shreveport*, 5 La. An. 661; *The People* v. *Pinckney*, 32 N. Y. 377; *City of Clinton* v. *Railroad Co.*, 24 Iowa, 475; *Berlin* v. *Gorham*, 34 N. H. 266; *The State* v. *Branin*, 23 N. J. L. 484; *Borough of Dunmore's Appeal*, 52 Pa. St. 374; *Broughton* v. *Pensacola*, 93 U. S. 269.   The position in the case at bar, that the powers and property are held as by a private corporation, ignores not only the necessity of artificial light for good government in cities, and that the choice

of means for obtaining such light, whether by manufacture
or by contract, is with the Legislature, but it ignores also
the fact that the connection between the power and prop-
erty here in question and the purely political functions of a
municipal corporation is closer and more essential than that
existing in some instances where the powers and property
are admitted to be public.

As was observed at the outset, it is not with any rights
accruing to third persons, or obligations insisted upon in
their favor, that we are here concerned, but with the rights
of the appellant and respondent, both of whom are directly
the subjects of the legislative enactments. The cases at this
point cited by the appellant have no application here. For
instance, no attempt is made to apply by analogy the facts
of *Bailey* v. *Mayor, etc.*, 3 Hill, 531, to the facts of this case,
but expressions of opinions used *arguendo* by Chief Justice
Nelson are cited. Even as doctrine applicable to the facts
of that case, the expressions as there uttered were unneces-
sary, and have since been disapproved. *Mayor of New
York* v. *Bailey*, 2 Denio, 433 ; *Darlington* v. *City of New
York*, 31 N. Y. 164. In the *Savings Fund Society* cases,
31 Pa. St. 175, 185, the question was as to the rights of cred-
itors to whom the gas-works had been pledged, and it was,
of course, held that the obligation of the contract could not
be impaired. The language as used in one of the cases was
afterward qualified, and carefully limited to the facts, in
*Wheeler* v. *Philadelphia*, 77 Pa. St. 354. The more
recent cases express the sounder view, and in these the
unqualified expressions of the earlier cases find little sup-
port. It is now seen that the line must be arbitrary which
affects to separate public powers from private powers,
where both have relation to good government, and are
bestowed by the Legislature with a view to the common
benefit ; and it is no longer held that public purposes cannot
be recognized because the Legislature sees fit to accomplish
them through grants which might be conferred on indi-

viduals or on private companies. *Darlington* v. *City of New York (supra)*; *Gas Co.* v. *Wheeling*, 8 W. Va. 320, 355; *Harlem Gas Co.* v. *Mayor*, etc., 33 N. Y. 309, 327; *Shepard* v. *Milwaukee Gas-Light Co.*, 6 Wis. 545; 1 Dill. on Mun. Corp., sec. 30, and note on p. 152, 2d ed.

The stockholders of the appellant bought their stock with notice of the legislative reservations, and are presumed to have known their legal effect. Upon certain conditions, the " mayor, aldermen, and citizens of St. Louis" were to receive and hold the gas-works, and were to possess the franchise granted by the General Assembly. These they were to hold, by the legislative grant, as public property. The City Council were agents for the citizens, with powers limited and defined by the charter. The extent of the authority of these agents was a matter of law, and was known to the appellant and the public. Where property or rights are conferred upon a municipal corporation for the benefit of the citizens, the officers of the corporation must use the property according to the trust imposed by the Legislature. As a matter of course, these agents for the time being cannot defeat the plans, or alter the policy, or dispose of the property of the State.

The sections quoted confer, so far as they respect the respondent, not ordinary property rights upon an individual, or mere business company, but give additional powers connected with its political function to a municipal corporation. This branch of the government, acting through a deliberative body, is to " resolve," is to exercise its best judgment, taking all the facts affecting the welfare of the city into consideration. If the city so decides, these powers pass to the citizens in their corporate capacity. As a part of the grant, and as a means of executing the new powers of regulation and control, the works and appurtenances, on the terms named, are also to pass. It is the resumption, by the State, of an extraordinary and exclusive franchise, conferred only with an express and carefully limited reservation upon

a private company, which franchise, the condition having happened, the State resumes, and for public purposes bestows upon the respondent. The powers are now become agencies by which the State carries out its policy of municipal government.

The facts in regard to the notice and resolution of 1859–60, to the ordinance of the City Council, the appointment of arbitrators, and the notice of the appointment, have already been recited. The respondent requested the appellant to appoint arbitrators, according to law and the ordinance. The board of directors of the appellant passed a resolution by which they refused to sell the gas-works to the respondent. It is contended by the appellant that, upon the basis of the proceedings of 1859–60, the present suit was not brought in time ; but, as the refusal of the appellant was not signified until Oct. 25, 1860 (the resolution to purchase having been passed by the City Council on June 28, 1859, and notice of it having been given to the appellant on June 29, 1859), it is not easy to see how the respondent could know that the appellant would refuse to comply with the law, until the respondent received the notice of Oct. 25, 1860. As the suit was brought upon May 21, 1870, it would not be barred by the statute. But the Statute of Limitations has no proper application to the case. It was not the intention of the Legislature that these acts, passed for special purposes, and, so far as the sections now in question are concerned, embodying a policy and carrying out a particular scheme, should be affected by the general statute of repose. Immediately, the present suit relates to the gas-works and their appurtenances, but the possession of this property is the means of carrying out the will of the State, by which, in a certain event, the franchises were to pass to the city, and the property to be purchased by it. The condition fixed by the Legislature happening, the franchise vested at once in the city. The omission to sue immediately on the appellant's refusal to sell did not give

to the appellant a new lease of life, nor does its *de facto* existence affect the question of its legal *status* at that time. Because the city's rights were not judicially ascertained it does not follow that they had no existence.

It is the office of the court of equity, as nearly as may be, to place a plaintiff who is entitled to relief in the situation in which he would have been, had the defendant observed his obligations and executed his contract. This is the basis of specific performance. Had the appellant appointed arbitrators and conveyed the property, as it agreed to do, and as the General Assembly anticipated it would do, its charter as an active business corporation would have ended in 1860, its franchise would have passed to the respondent, and the works and their appurtenances would, through the means of payment provided by the Legislature in 1859, have belonged to the city. Except under the contract of 1846, which is not now in question, it is only on the basis of its violation of its agreement, and its refusal to obey the legislative command, that the appellant held the franchise and property beyond the year 1860. But, as has been shown, the appellant cannot build up rights upon the basis of its own wrong. The law does not hold out a premium for disobedience to its commands. If the respondent had brought a bill to compel the appointment of arbitrators, after the appellant's refusal in 1860, the appropriate court of equity must have enforced the law. The respondent had complied with the act ; the appellant had violated an express condition of its contract ; and, apart from enforcement by those tribunals which administer the law and afford process, the law would have been idle words, and the design of the State defeated. The authorities at this point cited by the appellant, as to enforcement of an agreement to arbitrate, ignore this : that the present is not merely a contract, but a law. That "the price shall be fixed by arbitrators" is a fiat of legislative will, and as such addresses itself to the courts. The law itself makes the remedy.

The petition does not set out the resolution and other proceedings of 1859–60, but they are in evidence, and in this court objection to them as evidence is not insisted upon. Their legal effect is a proper matter of consideration. There is no dispute of fact in regard to the proceedings of 1859–60; and upon the facts, not upon questions turning narrowly upon pleadings, the case has been argued. Even were the present the only ground of decision, it could not be to the advantage of the appellant that the case should be reversed in order to make the petition conform more closely to the evidence. Besides, the consideration of the proceedings of 1859–60 arises from the position so strenuously maintained by the appellant, that the contract of 1846, so far as concerns the sections here in question, is void. If so, certain legal consequences follow, and the estimation of these is one method of solving important questions in the case. Thus, we have arrived at the conclusion that it does not follow, even if the contract of 1846 is void, that the respondent cannot maintain this action.

If the above sections of the act of 1837 have been properly construed, and the principles which have been laid down are correct, their application will go far towards solving many of the questions which arise under the contracts of 1846 and 1873. The sections of the contract of 1846, material to be considered, are as follows: "*Fifth.* The party of the first part (the city) agrees and does hereby relinquish the right to purchase the gas-works property, etc., of the gas-light company at the expiration of twenty years from and after the first of January, 1840, as provided for by the twenty-seventh section of the charter of said company; *provided,* that in the event the said party of the first part shall decline to purchase the gas-works property, etc., at the end of twenty-five years from and after the first of January, 1840, as is provided in the twenty-eighth section, it shall have the privilege of purchasing as aforesaid at the

end of thirty years from and after the first day of January, 1840, and at the period of every five years thereafter, in the manner as is provided in the twenty-seventh and twenty-eighth sections, and upon giving notice of intention so to purchase, as is provided in section twenty-eight of said charter. *Sixth.* That whenever the said first party shall have resolved on a purchase of the gas-works property, etc., of the gas-light company, as provided for by the twenty-eighth section of the charter of said company, or as provided for by the preceding fifth section of this contract, the arbitrators chosen in accordance with the provisions of the twenty-seventh section of said charter shall take into consideration only the value of the gas-works, and the lands, grounds, buildings, utensils, and appurtenances belonging exclusively to said works ; all privileges, rights, and interests conferred by said charter, except the privilege of lighting the city with gas, as also all property and effects not necessarily connected or appertaining to the gas-works, being reserved to the said gas-light company.'' Thus, these provisions refer directly to the charter. So far from being complete in themselves, they are unintelligible without reference to the acts which form their basis and reason for being. Nor does the petition attempt to proceed upon the contract of 1846, without reference to the charter. It could not do so, nor are its allegations of fact so framed ; while its allegations of legal conclusions are of no importance. The provisions just quoted are at most a graft upon the act of 1837, and it is from the source, not from the shoot, that the respective rights and obligations of the parties spring.

If, for all or any of the reasons alleged by the appellant, the contract of 1846 is void, then the relinquishment of the city's right to purchase in 1860 amounted to nothing, and, under the act, the franchise, resumed by the State, passed directly to the city. If, on the other hand, the city could relinquish the right in 1846, it must be because the parties

to the contract had the power to change the times prescribed by the charter. The power to relinquish in 1846 the privilege to be exercised in 1860, implies the power to provide other and future times of choice instead. But the converse of the proposition is not true. The power to extend the privilege to future times does not imply the power of the city of 1846 to relinquish the privilege which, by the legislative scheme, was to be exercised by the city of 1860. The difference is, that in 1846 the conditions on which, according to the design of the General Assembly, the judgment of the city officers was to be exercised in 1860, did not exist. The choice was as to a matter of great importance, and implied consideration of many particulars : of the city's population, extent, resources ; of the appellant's condition, property, capacity for making and distributing gas ; of the public demand for gas, etc. It is obvious that the City Council of 1846 could form no estimation of how these matters would be in 1860, and that the city of 1860 could not, unless the will of the Legislature were to be defeated, be deprived of a privilege the necessary conditions of which could not exist in 1846. But no such conclusive argument can arise to show that the parties could not extend the time fixed by the act. All the conditions of choice existed in 1870, and would exist at periods of five years thereafter.

Whether time is or is not of the essence of a contract depends on many circumstances, some of which have no bearing on ordinary questions of construction. It was formerly the doctrine of chancery that the parties could not make time essential. *Gregson* v. *Biddle*, cited by Sir Samuel Romilly, in *Seton* v. *Slade*, 7 Ves. 265. Though this is no longer held, yet time is not ordinarily of the essence of contracts, and the mere use of negative words does not make it so. The general intention overrides particular words. The courts look at the object for the insertion of the provisions as to time, to questions of resulting injury, to the possibility of compensation, and especially to the

manner in which the parties themselves have treated this feature of the contract. Cases collected in 2 White & Tudor Ld. Cas. (4th ed.), pt. 2, pp. 1060, 1105. Here the question arises upon a legislative act, and it is apparent that the intent of the Legislature was that a period should intervene before the exercise of the privilege, which period, while it would afford a fair term of existence for the appellant, would, with the evidence it would furnish, enable the respondent to exercise a sound judgment. There is nothing in this inconsistent with a later choice, while to the appellant a later choice is beneficial.

But let it be supposed that the times are essential; we come, then, to the conduct of the parties. In *Benedict* v. *Lynch*, 1 Johns. Ch. 370, express words avoiding the contract were used; yet Chancellor Kent, after reviewing the authorities, came to the conclusion that, while in such cases time is of decisive importance, it may be waived by the parties themselves; and he quotes with approbation the following words, used by Lord Loughborough in *Lloyd* v. *Collett*, 4 Bro. *469: " In most of the cases, there have been steps taken. *  *  * I want a case to prove that, where nothing has been done by the parties, this court will hold, in a contract of buying and selling, a rule that certainly is not the rule of law, that the time is not an essential part of the contract." So, in *Falls* v. *Carpenter*, 1 Dev. & B. Eq. 277, Chief Justice Ruffin says that where time is a substantial part of the contract, " a court can no more dispense with it than with any other vital provision. But the parties themselves may dispense with it; and the inquiry, where it has once existed, is whether they have dispensed with it." That time ceases to be important when the parties cease to treat it as such, and that they may waive the objection by their acts, is well settled. *Webb* v. *Hughes*, L. R. 10 Eq. 281; *Wells* v. *Maxwell*, 32 Beav. 408; *Hunter* v. *Daniel*, 4 Hare, 420; *Hull* v. *Sturdivant*, 46 Me. 34.

In the present case, the postponement of the time was in

the appellant's own favor, and this postponement it secured for itself by the contract of 1846. This contract it enjoyed the benefits of for many years. When, in 1860, the respondent insisted upon the time as prescribed by the charter, it was the appellant who refused, and insisted upon the delay afforded by the contract of 1846. In 1860, the appellant refused to appoint arbitrators or to sell, on the ground that by the contract of 1846 the city had relinquished its right to purchase in 1860. When the city insisted, under the contract of 1846, upon its right to purchase in 1870, the appellant replied that the contract of 1846 was void. Thus, so long as the times fixed by the Legislature were unexpired, the contract which extended these times was made the pretext for not then performing the charter obligation; and when the charter times of purchase were past, the extension of them was found to be without authority, and void.

The application of the principles laid down in the cases cited, to the facts here involved, is obvious. Whether the words of the act are mandatory in relation to the times or not, it does not lie in the appellant's mouth to urge that they are so. Its own acts stand in the way, and it can invoke in its favor no principle of equity. The respondent wished to comply with the terms of the law as to time; the appellant refused to do it. From the failure to adhere to the provisions as to the stipulated periods, the respondent derived injury, the appellant benefit. If we inquire whether there has been delay injurious to the party resisting performance, the answer is, the delay has been to its advantage.

The stockholders of the appellant, who urge that without their consent the contract of 1846 could not be made, by virtue of that contract enjoyed the franchise from 1860 to 1870. The directors of the appellant, who, it is claimed, had no power to sell out the business of the company and terminate its existence in the future, did, in fact, by insisting on the contract which they subsequently repudiated, prolong the company's enjoyment of the franchise for ten years.

On the facts of the case, the appellant can found no defence on the ground that the provisions of the charter in respect to time are of the essence of the contract.

In another aspect of the case, reasons pointing to the same conclusion arise. The appellant was bound to obedience to the law. The command of the Legislature was directed expressly to it. It could not by circuitous action do what it could not do directly, and defeat the public purpose of the State. The whole argument founded on the necessity of adhering to the times named in the act is of no avail unless it has this for its basis: that the city had an opportunity, at those times, of exercising its privilege. The purpose of the Assembly, not in regard to a mere matter of time, but in regard to the privilege itself, is defeated if the city is deprived of its choice. The essential purpose may be carried out if the period of decision merely is postponed; the whole scheme is set at naught if the opportunity for decision is not given. But the facts of the case show that, owing to the conduct of the appellant in 1860, the city forbore to press its right, and in 1865 forbore to pass any resolution. It was justified in believing that, as the contract of 1846 expressly provided that in the event the city shall decline to purchase in 1865 it shall have the privilege in 1870, these words meant something, and that, after getting the benefit of this provision, the appellant would, as it had engaged, allow the privilege in 1870. It is not by playing fast and loose with the contract — by now asserting, now denying its validity — that the exercise of the right can be prevented and the scheme of the General Assembly be defeated. It was not the intention of the Legislature that the appellant should, by management, or by any act of its own, renew its charter and prolong its life until 1890. Its monopoly, after 1860, depended on the city's action, and the appellant was bound to do nothing to defeat the city's privilege.

The application of the doctrine of estoppel to the con-

duct of the appellant is too obvious to require exposition; but, on the ground stated, and without reference to estoppel, the appellant cannot successfully attack the provisions quoted from the contract of 1846. It nevertheless remains true that, by inducing the respondent to believe that it could rely on the contract of 1846, the appellant prevented the respondent from obtaining a decree upon the basis of the proceedings of 1859–60. As has been said, a court of equity would have decreed performance upon these proceedings. Thus, the appellant has enjoyed the franchise and property for ten years, when, except on the basis of a faithful observance of the contract of 1846, it had no title to either beyond 1860. It has done what the law forbids, moreover, in changing its ground, and putting its present conduct, on which it seeks to make out its defence in a court of equity, on a foundation inconsistent with that upon which it enjoyed the property from 1860 to 1870. Where, after suit is brought, a defendant bases his defence on grounds inconsistent with those taken by him before suit, especially where, by his former conduct, he has led the plaintiff to surrender rights, the defendant is precluded from changing his ground and setting up a defence inconsistent with his former position. *Duffy* v. *O'Donovan*, 46 N. Y. 223; *Railway Co.* v. *McCarthy*, 96 U. S. 258; *Gould* v. *Banks*, 8 Wend. 567; *Everett* v. *Saltus*, 15 Wend. 474. The examination, below made, of the contract of 1873, shows that there is no parallelism, so far as the doctrine of estoppel is concerned, between the acts of the appellant in reference to the contract of 1846, and the acts of the respondent in reference to the contract of 1873. As a legal proposition, the appellant and its stockholders knew that the City Council, for the time being, had no power to make the contract of 1873; as a proposition of fact, that contract carries evidence on its face that they knew or suspected this. The contract of 1873 was and remained unexecuted in its most

essential feature. Both parties acknowledged the contract of 1846, and lived under it until the appellant denied its obligation in 1869.

It is with the sections of the contract of 1846 above quoted that we are concerned, not with clauses foreign to the subject of this action. As it is no good ground of estoppel against the appellant that it brought suit on the contract of 1846, so it is none that the respondent failed to observe some of its obligations in reference to matters foreign to those now in question. Matters are not made *in pari materia* by putting them in the same contract. The subject is to be considered; and so far as relates to the obligations here essential, the respondent performed all which were incumbent on it. Two acts of the General Assembly were procured providing for means of payment. It is true, no resolution was passed in 1865, and no suit was brought until 1870. But the city had no reason to doubt that the appellant would adhere to its contract. In the state of things which existed up to 1869–70, it would have been bad faith on the respondent's part to sue; and equity does not require acts inconsistent with the *uberrima fides* which it does require. In 1869, the city gave notice, resolved to buy the gas-works, and appointed arbitrators to value them. Early in December, 1869, the appellant refused to appoint arbitrators, or to sell. On May 21, 1870, this suit was brought. Before that, though not executed in form in the eye of equity, the purchase was made. In legal contemplation, the price of the gas-works and their appurtenances was fixed. The respondent held the amount of the purchase-money in trust for the appellant, while the appellant held the legal title to the gas-works and appurtenances as trustee for their equitable owner, the city. The vendor in such cases is, from the time of his contract, a trustee for the purchaser; and the vendee, as to the money, a trustee for the vendor. — *Green* v. *Smith*, 1 Atk. 572; *Huffman* v. *Hummer*, 17 N. J. Eq. 263; *King* v. *Ruckman*, 21 N. J. Eq. 599;

*Richter* v. *Selin*, 8 Serg. & R. 440 ; note to *Seton* v. *Slade*, 2 White & Tudor Ld. Cas. (4th ed.) 1108, pt. 2 ; Sugden on Vend. (8th Am. ed.) 270, chap. 5. The doctrine is, that the purchaser is the owner of the land, in equity, subject to the payment of the stipulated price ; the ownership resulting, not from any payment of the purchase-money, but from the contract. *Siter's Appeal*, 26 Pa. St. 178. To the facts of this case the doctrine has a direct application.

Such was the condition of things when the contract called the tripartite agreement was entered into. This contract has been placed in antagonism to that of 1846, and the weapons with which the respondent has defended the contract of 1846 have been turned against it when it has attacked the contract of 1873. But there are broad contrasts between the contract of 1846 and that of 1873. The contract of 1846, in the features with which we are concerned, carries out the charter and the legislative will, while to essential features of these the contract of 1873 is in direct antagonism. Though by the contract of 1846 the right of the city to decide in 1860 is surrendered, yet, as the substitution of later periods carries with it the material conditions of choice, if the contract of 1846, as made, is carried out according to the intent of the parties as expressed in it, there is in this respect no essential violation of the legislative will. If for its own benefit the appellant insisted on later periods, and the city acquiesced, what reason for objection could there be, provided the city in 1869–70 had its free choice? The divergence, if such, upon the facts of the case was immaterial, and the facts showing its immateriality are stronger, in this respect, than those of almost any case which the books afford.

It is claimed that there is a difference between the property which, under the charter, was to pass to the city by purchase, and that which was to pass, by purchase, by the contract of 1846. But the charter does not show that other property besides the gas-works and appurtenances was to

pass to the city by the purchase. The "rights and interests" named in sec. 27 are a part of the gas-works and appurtenances, as is shown by the phrases being used interchangeably. The property to pass under sec. 27 is not greater in extent than that which is to pass by sec. 28, because the description in the former is more diffuse. Nor does sec. 27 say that the arbitrators shall value any thing more than the gas-works and appurtenances. These, by the charter, as by the contract of 1846, were to pass by the purchase; while the franchise had nothing to do with the purchase, but passed to the city as property of the State, not of the appellant. The payment which was to be subsequently made was payment for the "gas-works and appurtenances," not for the franchise. The city was not to pay for the State's property.

The franchise was, just before the execution of the contract of 1873, in the city, and the appellant had no power to contract as it did. It was indeed a *de facto* corporation, and of course could be sued and treated as such. But, apart from the fact that the franchise had vested in the respondent, the gas-works and appurtenances were held in trust for the respondent. These the city officers had no power to part with, under the guise of dismissing a suit. A suit may be any thing or nothing. To ascertain the nature of the act proposed to be done, the nature of the suit must be ascertained. Here the act involved the surrender, by the city officers, of the gas-works and franchise. The decree of the court below in this case has not created any rights or liabilities; it has merely ascertained and established those which were before existing. Sufficient has already been said in regard to the nature of the franchise and the gas-works, their character as property, the purposes for which they were by the State intrusted to the city for the citizens, as well as the relation which the city officers bore to those for whom they acted, to show that the city had no such power as that implied in the so-called arrangement to dis-

miss the suit. In contracting with the city authorities, the appellant was in the position of a person who, knowing that another has strictly limited powers, enters into a contract, taking the chances whether the question of authority will be raised.

Not only did the tripartite agreement, under a clause providing for the dismissal of a suit, provide for the surrender of the franchise of the city and of the gas-works to the appellant, but in express terms that contract provided that it should be a substitute for the contract of 1846, and that the latter should be cancelled, and each party absolved from its obligations. Thus, the contract of 1846 is again, and as late as 1873, recognized by the appellant as an existing contract, but recognized only to be destroyed ; a destruction, however, which would seem to imply its previous existence. In this clause, the effort and intention is apparent, the success of which would, upon the appellant's own basis, defeat the legislative will and render nugatory the scheme by which the city was to have, at two periods, separated by an interval of five years, the privilege secured to it. Up to the date of the tripartite agreement, Feb. 28, 1873, the respondent, upon the appellant's basis, had never had these privileges, which are the vital part of the legislative scheme. It had not, according to the appellant, had an opportunity of exercising the privilege in 1859–60, because the contract of 1846 prevented ; so the appellant alleged at the time. The city had had no opportunity in 1869–70, because the contract of 1846, which extended the charter times of purchase, was void ; so the appellant alleged at the time. Thus, just before the execution of the tripartite contract, the respondent, according to the appellant, had never had any two opportunities of choice, separated by an interval of five years. Though it may well be that the General Assembly thought it immaterial what precise periods of choice should be selected, it is undeniable that they intended that there should be two opportunities, and that the two should be

separated by a considerable interval of time, which probably would bring with it additional materials for forming a sound judgment. If, then, the respondent had had no two such opportunities, it is evident that the tripartite contract, in cancelling the contract of 1846, and thus preventing any choice under it, effectually destroyed a privilege which was an essential part of the legislative scheme.

In the case of *Wiggins Ferry Company* v. *Railroad Company* (*ante*, p. 347), this court had occasion to consider, as affecting the validity of a contract, the power of a corporation to bind itself not to exercise part of the franchise committed to it by the State for public purposes. That case related to incorporated common carriers; but this feature creates no difference, the essential question being whether the public interests are involved. The authorities there cited, and what was there said, apply, so far as the principle is concerned, to this case. The rules by which the powers of such corporations are thus indirectly restrained rest upon principle, and their application to cases involving the validity of contracts made by such corporations is undoubtedly correct. It would indeed be singular doctrine, that, while the power of the State is limited, while it ceases to be sovereign, as, so far, it does when restrained by the obligation of a contract, the other party to the agreement should not be bound by a corresponding obligation. But the grantee in such grants is a subject of the law, as well as a contracting party. Franchises, often of immense value, are committed to such companies on the condition that they will serve the public according to the terms of the grant. If they may depart from those terms, they may select the profitable part of the franchise, and disregard those parts which, in the eyes of the grantor, were the consideration of the grant. This they cannot do. They cannot alter the grant, or make such provisions in contracts as imply the refusal or inability to exercise, on their

part, powers which the State has intrusted to them, and in the exercise of which the public has an interest. It matters not whether the surrender of the powers is beneficial or injurious. Of this the Legislature is the judge, not the officers or stockholders. The question is of departure, not of benefit or injury arising from the departure. As corporations are strictly limited to the powers given, and cannot exceed them, so they cannot depart by surrendering powers which they have. Creatures of the law, they must proceed in one way as in another, according to the law which created them. Nor can the attempt to absolve themselves from their obligations be rendered successful by disguising the purpose or effect. Under such circumstances, the law will, as said by the Supreme Court of the United States, strip a corporation of every disguise, and enforce a responsibility according to the very right of the matter. *York, etc., R. Co.* v. *Winans,* 17 How. 30; *Black* v. *Delaware, etc., Co.,* 22 N. J. Eq. 130, 309; *Pierce* v. *Emery,* 32 N. H. 504, 507; *The Commonwealth* v. *Smith,* 10 Allen, 448; *Troy, etc., R. Co.* v. *Kerr,* 17 Barb. 601; *s. p., Pacific R. Co.* v. *Seely,* 45 Mo. 212; *Fuller* v. *Dana,* 18 Pick. 272; *Marsh* v. *Railroad Co.,* 64 Ill. 414; *Wiggins Ferry Co.* v. *Railroad Co., supra,* and authorities there cited. The same doctrine — that a corporation which, though not a public one, is incorporated upon public considerations, and receives a franchise from the State to accomplish a purpose in which the public is interested, undertakes, to use the words of Lord Eldon, to do and submit to whatever the Legislature empowers and compels it to do, and nothing else — is well settled in England. *Blakemore* v. *G. C. Navigation,* 1 Myl. & K. 162; *Queen* v. *Railway Co.,* 10 Ad. & E. 531; *Beman* v. *Rufford,* 1 Sim. (N. S.) 565, 569; *Directors, etc., of Shrewsbury Ry. Co.* v. *Directors Ry. Co.,* 6 H. L. Cas. 113, 135; *Winch* v. *Railway Co.,* 5 De G. & Sm. 562; *Great Northern*

*Ry. Co.* v. *Railway Co.*, 9 Hare, 306 ; *East Anglican, etc.,
Ry. Co.* v. *Railway Co.*, 11 C. B. 253, 775 ; *McGregor* v.
*Official Manager, etc.*, 16 Eng. Law & Eq. 180.

It is objected that the surrender of the power, however
unauthorized, is not properly in question here, and that
whether the contract of 1873 is *ultra vires* is not a pertinent
inquiry.    But if, as the cases cited show, a contract thus
beyond the power of the corporation to execute cannot
be the foundation of an action, how can it be the founda-
tion of a defence?    The cases of *Bissell* v. *Railroad
Co.*, 22 N. Y. 258, and *Whitney Arms Co.* v. *Barlow*,
63 N. Y. 62, have no application here.    The present is not
a case of a corporation, to which a consideration has passed,
seeking to repudiate the corresponding obligation on the
ground that its contract was *ultra vires;* and the public pur-
pose creates another essential difference.    Here, the defend-
ant corporation pleads the contract, and, as against a plaintiff
who makes out a *prima facie* case, asks a court of equity
to declare that the contract of 1873 is a valid contract, and
to award rights and property to the defendant, on the
ground that the contract *is* valid.    Even where a case is
not founded on the agreement, yet if the action or inter-
ference of the court would promote the object of the agree-
ment, or extend or facilitate its operation, the court will
not assist either party in obtaining a collateral benefit aris-
ing out of a contract which is *ultra vires* of a corporation
and against the policy of the law.    *Great Northern R. Co.*
v. *Railway Co. (supra).*    In *Taylor* v. *Railway Co.*, the
point was made and overruled that dissentient shareholders
only could take advantage of the objection of *ultra vires* in
such cases, by bill in equity.    L. R. 2 Exch. 369.

In considering the contract of 1873, we must look at the
intention of the parties, and the purpose which the con-
tract itself shows was intended to be accomplished.    It is
obvious that the two companies, the appellant, and the
Laclede Gas-Light Company, intended to divide the city

between them, as territory within which they were in future to operate. The appellant does not contract with the city that the Laclede Gas-Light Company shall furnish gas in the district north of the south line of Washington Avenue, but each company for itself agrees with the city that it will supply the public lamps, etc., in the district or part of the city "to be occupied by it." The appellant, in fact, surrendered to the Laclede Company all the territory north of the south line of Washington Avenue, and, in return for this, the Laclede Company surrenders an exclusive right which never had any existence. It is urged that the appellant does not preclude itself from furnishing gas to private consumers north of Washington Avenue; but it is evident that the appellant's abandonment of that district to the Laclede Company is, and is intended to be, complete. By the contract between the two gas companies, made about fifteen days before the tripartite contract, the appellant sold to the Laclede Company the gas-mains, pipes, lamps, and other property of the appellant in the district north of Washington Avenue, and it was agreed that after a certain time the appellant should disconnect the mains and pipes of the two districts, "giving to said Laclede Gas-Light Company all the aforesaid property within the said district, or portion aforesaid of said city, and retaining and reserving for itself, the St. Louis Gas-Light Company, all the remainder of said city." By this contract, each of the companies agreed not to intrude, in the making or vending of gas, on the portion of the city to be occupied by the other. The evidence shows that, before this contract was made, the appellant had notified the Laclede Company not to sell gas in the district by the contract surrendered, and was preparing a bill to restrain the Laclede Company from so doing; while, after the execution of the contract, the appellant ceased to sell gas in that district.

The public purposes for which this franchise was given to the appellant are obvious from what the acts contain. To

divide the franchises, or to depute their performance to a stranger, is to violate the trust, on the faith in the performance of which the State made the grant. In a public trust, the selection implies personal confidence in the grantees, reposed by the State. To do as the appellant did, implies the power to disregard the trust and violate the contract, — to use, divide, surrender, or sell a public franchise at pleasure. If the appellant could sell part, why not all? If to the Laclede Company, why not to any stranger? And what security has the State that the public interest will be subserved? The appellant here asserts the validity of the contract of 1873, and asks the court to say, as against the *prima facie* case made out by the respondent, that, by reason of that contract, certain rights have accrued to the appellant. But a court can give its sanction to this contract, on the ground now put forward, only by adopting a doctrine that is as clearly at war with principle as it is dangerous in its tendencies. If the State is strictly bound by the terms of the contract, the other party must be; and the security which the people have that corporations holding great powers will be kept within due limits, is that such corporations be not permitted to use or misuse those powers at their mere pleasure. In the present case, the excuse seems to be that the monopoly ceases, and that the territory as to which the franchise is bargained away is open to the public. This is beside the question. The argument implies that the subject is more powerful than the sovereign; that, while the State cannot alter without the consent of the grantee, the grantee may alter without the consent of the State.

It is urged that the city derived advantages from the contract of 1873 ; that suits were dismissed ; time given for the payment of debts ; a standard fixed, below which gas could not be manufactured ; an obligation imposed upon the appellant to pay salary for a gas-inspector ; and that the city, being a stockholder in the appellant, received a portion of the purchase-money paid by the Laclede Company to the

appellant. An examination into many of these matters shows that the advantage to the city was nominal, rather than real; but this is immaterial. Such was the character and legal situation of the franchise and the property, such are the powers of municipal officers, that the appellant and its stockholders had notice that the city officers of 1873 could not bind the citizens by the provisions of the tripartite agreement which are here discussed. If the appellant surrendered advantages, it did so with its eyes open. But, in truth, the appellant is in no situation to complain. It persistently, and whenever question was made, either in 1859–60 or in 1869–70, had refused to submit to arbitration, or to sell. Its complaint is, in effect, that by the contract of 1873 it has not been enabled to do away with the consequences of its own violations of its charter, and get rid of the suit then pending to establish these violations.

But, further, how can the appellant in reason complain of advantages it has surrendered, when the contract of 1873 carries evidence on its face that the two companies knew the risks they were running, and took them as a part of their bargain? " Such surrenders and abandonments by both companies to be done and effected in legal and binding manner." What does this clause mean? Especially is this question pertinent when it is considered that the suit of the city was not dismissed, and when we also consider, in connection with its non-dismissal, the testimony of the then mayor of the city. As to the most essential part of the tripartite agreement, that agreement was and always remained unexecuted; and, by assent of the parties, its execution seemed to depend, if not on what is referred to in the clause just quoted, then on some condition not embodied in the contract. It is impossible to avoid being impressed, from the whole evidence, with the conviction that the validity of the agreement as made was a mooted point when the contract was executed; that the two companies intended to procure a legislative sanction if they could,

and, failing to procure it, to insist that the agreement was valid anyhow. On the city's part, the mayor insisted that the appellant was bound by the contract to procure legislation. That the appellant acquiesced in this is the fair inference, since there was no insistence on the appellant's part that, as a matter of contract, the suit must be dismissed; since repeated efforts were made to procure legislation; and since, these failing, the suit remained pending as before the agreement.

It follows from what has been said, that the respondent was entitled to a decree; that the dismissal as to the Laclede Company was not error; and it also follows, if the principles laid down are correct, that the appellant was properly charged with profits from Jan. 1, 1870. It is assumed that in respect to the question of profits the appellant stands in the same position as a person who has made an ordinary contract for the purchase of real property, which the vendor refuses to convey. This position ignores a vital fact: that the franchise, by which alone the profits could accrue, had been resumed by its owner, the State, and had, during the pleasure of the State, become the property of the city. The provisions of the charter to this effect have been fully discussed. The appellant continued to use, as before, the franchise, and to use also the works and appurtenances which it held in trust for the city. Its use was further wrongful, as the appellant was disobeying an express command addressed to it. If this command had been obeyed, the appellant could have reaped no profits, nor can the law presume that proceedings would have been indefinitely protracted. The appellant is entitled to urge no such plea, as its positive refusal, before Jan. 1, 1870, to comply with its contract fixed its position. The principles upon which equity proceeds in reference to compensation apply with a force increased by the peculiar circumstances of this case. *Worrall* v. *Munn*, 38 N. Y. 137 ; *Nelson* v. *Bridges*, 2 Beav. 239 ; *Corporation of Ludlow* v.

*Greenhouse*, 1 Bli. (N. S.) 17; *Todd* v. *Gee*, 17 Ves. 278; *Woodcock* v. *Bennett*, 1 Cow. 711; *Wall* v. *City, etc., Co.*, 9 Q. B. 249. Making use of the franchise and works, the trustee, with full knowledge of its legal obligations, chose to proceed, even after suit brought, in a business, the profits · of which, as the evidence shows, are regular and very large. Without the franchise and its use, there could have been no profits; and as the law affords full compensation to the appellant for the works and appurtenances, the appellant has no ground of complaint.

To give it interest would be obviously inconsistent with the theory upon which equity proceeds. The appellant is not entitled to be put in the same situation in which it would have been had it obeyed the law. It has throughout stood upon the basis of denying any right in the respondent, and has refused all tenders. It is not entitled to interest. 6 Watts, 162, 207; 2 Watts & S. 365; 2 Sandf. Ch. 273; 16 Serg. & R. 268.

It is further objected, that the court below erred in allowing the suit to be dismissed as to the Laclede Company, and charging the appellant with the amount received by it from the Laclede Company on the latter's purchase; that the decree is inconsistent, because, while it proceeds upon the basis that the surrender and sale were *ultra vires* of the appellant, and that the appellant ceased to exist as a corporation in 1870, or at least in 1873, the decree nevertheless charges the appellant with $655,000, the sum which the appellant received from the Laclede Company on the purchase. It is said that the court below thus affirmed the sale which it had decreed to be void, and gave life to a corporation which, on its theory, had ceased to exist. But these inconsistencies are imaginary. As well might it be argued that when a court gives judgment against a defendant in an action for money had and received, the court necessarily affirms the validity of every step that leads up to the receipt of the money. Facts do not cease to be such

because they are preceded, or even produced, by illegal transactions. Here the appellant was acting as a corporation, and liable, therefore, to be treated as such. The court below, proceeding upon the evidence in the case, charged the appellant with the proceeds of the sale, as, according to the authorities already cited, a trustee is liable to be charged when he has sold the estate held in trust. The mere change of form in a part of the property is unessential, and equity considers that the fund representing the property sold is still a part of the unsold property, and, like that, charged with the trust. It should be borne in mind that the appellant here received the amount of the proceeds of the sale, not only while it held the property in trust, but even after the suit had been brought.

It is finally objected, that if the appellant is to be charged, as it is, with the amount which was received for the property north of Washington Avenue, the appellant should be credited with what the property had cost. But it appears from the decree, that the appellant is credited with "the value of the gas-works and property of said defendant as the same existed on Jan. 1, 1870, which value the court finds to be the sum of $1,565,468.73, and also five per cent," etc. The appellant asserts that this amount does. not include the property north of Washington Avenue, which, under the theory of the decree, belonged to the appellant. This assertion appears to be wholly without foundation, if we are to judge by the commissioners' report, by the decree, and also by the conduct of the appellant in the court below. It seems clear that in the above aggregate the whole property, that lying north as well as south of Washington Avenue, is included. To say that the sum named comprises merely the latter, is expressly to contradict the words of the commissioners' report. On Jan. 1, 1870, there had been no sale, and the "commissioners report that the gas-works and property of the St. Louis Gas-Light Company, upon Jan. 1, 1870, consisted of real,

personal, and mixed estate, having a value as follows: Coal and gas on hand, $115,533.95; all other property, $1,565,468.73; total, $1,681,002.68."

The commissioners are here reporting as to a fact actually found by them. Afterward, when giving schemes or possible plans for the statement of accounts, they say, under the third head, that that plan "is made up by assuming the works in 1873 (after sale) to have included the same items of property as on June 5, 1876," etc. There, and upon that basis, the appellant is credited " with the value of the works as they exist on June 5, 1876, at prices prevailing in 1870," etc. So, in the same way, assumptions are made and a speculative basis adopted in the fourth plan. Both of these were rejected by the court below, which proceeded upon the basis of crediting the appellant with the value of the whole property as it existed on Jan. 1, 1870, as found as a fact by the commissioners, and charging the appellant with the amount it received from the Laclede Company, not with any estimated profits upon the property sold to the Laclede Company. It would indeed be singular if, disobeying the interlocutory decree, the commissioners had neglected to find one of the first facts to be found, the value of the whole property in 1870; yet, if not in the clause first above quoted, it is not to be found in their report. It is a curious fact that the appellant discovers for the first time, in this court, that it has received credit only for the value of the property south of Washington Avenue. In its exceptions to the commissioners' report in the court below, its objection was not that the commissioners had omitted to find the value of the whole property as it was on Jan. 1, 1870, but that that value, as found, was too small.

No error has been pointed out in the record, and the judgment of the court below will be affirmed. Judge BAKEWELL concurs. Judge LEWIS, having been of counsel, did not sit.