233 S.W.2d 746 (1950)
CURLEE
v.
DONALDSON et al.
No. 27909.
St. Louis Court of Appeals, Missouri.
November 2, 1950.
*748 Wm. H. Leyhe, Jr., Kerth & Schreiber, Clayton, for appellants.
George M. Hagee, Raymond F. McNally, Jr., St. Louis, for respondent.
HOUSER, Judge (sitting by order of the Supreme Court).
This is a statutory action for treble damages for wrongfully and knowingly entering plaintiff's land without his knowledge or consent and cutting and carrying away growing timber in which defendants had no interest. The action was brought under Article 2, Chapter 28, R.S.Mo., 1939, Mo.R.S.A. Defendants, the Bolz-Donaldson Company and James W. Donaldson, its president, answered by way of general denial. Tried to the court sitting as a jury, the issues were found for plaintiff and against both defendants for $750 actual damages. The court found that defendants had no probable cause to believe that the land or timber was their own, and judgment was entered accordingly for $2250. Separate motions for new trial filed by the defendants were overruled, and this appeal followed.
Appellants' first assignment of error is that the verdict and judgment is contrary to and not supported by the evidence. Since this case was tried by the court on jury waiver we must review it upon both the law and the evidence, as in suits of an equitable nature; we must not set aside the judgment unless clearly erroneous and due regard must be given to the opportunity of the trial court to judge of the credibility of the witnesses. Civil Code of Missouri, Laws Mo. 1943, p. 388, Sec. 114(d), Mo.R.S.A. § 847, 114(d). It is the duty of this court to render such decision as we believe the trial court should *749 have rendered. Blanke v. American Life & Accident Ins. Co., Mo.App., 230 S.W.2d 134.
Plaintiff Francis M. Curlee owned and was in the possession of certain timber lands in St. Charles County, Missouri. The owner of the land adjoining plaintiff's property on the north, William Toedebusch, contracted with Bolz-Donaldson Company on September 16, 1941, for the sale of the growing timber on his land for $500, allowing the company one year within which to cut and remove the timber. There was a fence all around the land. At the time the contract was signed, Toedebusch showed the company representative, Robert Mueller, over the ground, pointed out the boundaries, and told him not to cut beyond them.
Employees of the Bolz-Donaldson Company were sent onto the Toedebusch land about June 11, 1942 to fell the white oak trees, cut the timber into 39-inch lengths which, when quartered, are called "stave bolts". These bolts were "skidded" or dragged out of the woods by teams of horses, then hauled by truck to the stave mill of the defendant Bolz-Donaldson Company at 8600 Page Avenue, St. Louis County, Missouri. Four woodcutters were employed by the corporation. They worked in two-man teams, using cross-cut saws. They lived with their wives in tents, camping in the woods. The horses were owned by the skidders and were kept in a corral near the camp. The timber cutting on this land occupied about one month's time. The boundary line around the Toedebusch tract of timber was shown to the woodcutters when they commenced their work and they were instructed by the Bolz-Donaldson Company representative to cut "on the inside of the fence." The only information the cutters had about the true line was what they were told by the company representative, who customarily would show them where to cut, and they "cut there".
Defendant James W. Donaldson was president, treasurer and general manager of the Bolz-Donaldson Company. The sole directors and stockholders were James W. Donaldson, his brother and his sister. He had complete control over the cutters, "including the wood cutting operations on the propertyincluding everything, to the best of my (his) ability" (parentheses ours). In answer to the question, "You ran the show, didn't you?" he answered, "Yes, sir". He further testified, "A. I was the general manager; whatever duties were necessary to operate the company, I was prepared. Q. Were you generally familiar with the work the company was doing in their operations? A. I think so, pretty well."
He testified that he did not personally tell the woodcutters where to cut and when to go out to the woods; that he had certain forest foremen and that he would tell the forest foreman to take the men out to a certain job; that the foreman would do so, leaving them "as a rule" in the woods to cut, after giving them their orders. After a few days the foreman would return to the job to check up on them. Donaldson testified, "I wasn't the main one in the woods; I never went to the woods."
He further testified that "part of the time" he knew where his crews were working, but that he would not always know where they were cutting; that he had men cutting near Wentzville, Moberly, Springfield, Palmyra, Missouri, and Palmyra, Illinois, at the time of the taking of his deposition, and that he could not tell where any of them were; that they cut sometimes without his knowledge. He stated that he "kept in touch with the progress of the work by periodic reports."
When first interrogated by way of deposition on December 6, 1948, Donaldson testified that he would not recall the cutting of timber in 1942 on the Toedebusch tract, but he recalled it when the written contract between Toedebusch and the company was shown to him. He did not remember how many men or how many crews worked on this operation, or whether he had a foreman on the job. Later in the deposition he testified positively that there was no foreman out there. At the trial in April, 1949 Donaldson testified that Otho Dillard was foreman on the Toedebusch job.
Donaldson testified that he did not know whether any of his men cut timber on plaintiff's property. He said he did not *750 personally direct the cutting on the Toedebusch job at any time; that Dillard gave directions to the woodcutters. It seems that Otho Dillard, the forest foreman, went out on the Toedebusch job in the first or second week in June, 1942; that he left the employ of the company in the last week of June, 1942 and that after the first of July there was no foreman on the job. From the first part until the last part of June he was in charge of the woodcutters, gave them their directions. It was his duty to see that the cutters did not get over the line and to "scale the bolts", that is, measure them for the cutters, who were paid accordingly. He did not spend all of his time with them in the woods. He testified that during the three weeks he acted as foreman of this work, he went onto the Toedebusch property on three separate occasions, spending about three hours in the woods on each of these trips, or a total of nine hours on the land in three weeks. Donaldson testified that he "must have thought the safe thing to do" was to instruct Dillard to be sure the men didn't cut across the line, and he "imagined" he told Dillard this. Donaldson does not remember telling any of his employees thereafter to be careful not to cross the line. After Dillard left the employ of the company he was not replaced, so that thereafter the defendant company had no foreman in St. Charles County to give the woodcutters orders. After Dillard's departure the men had no one but defendant James W. Donaldson to look to for orders; there was no intermediate foreman between Donaldson and the cutting crews after Dillard left, and after Dillard's departure nobody gave the cutters any orders, according to Donaldson.
Donaldson was not out in the woods during the course of the company operations on the Toedebusch tract prior to July 1, 1942 and did not appear there until either the 10th or the 13th day of July. He testified that to the best of his knowledge there were no trees cut after Dillard left; that the men did not work thereafter; that "if they did, they didn't get paid for it"; that they were living out there in tents, doing nothing; that they "wound up the job out there." In his deposition, however, Donaldson testified concerning his trip to the Toedebusch woods on July 10, 1942 as follows: "Q. Were your men working up there at the time? A. They were all there; yes, sir."
The cutters were paid by checks issued by "Bolz-Donaldson Company, a Corporation". Donaldson said all of the men got paid, but were not paid for anything they did not cut. Two company checks issued to Oscar Cross, one of the woodcutters, were in evidence, one dated July 7, 1942 for $16.90 (for 338 feet at 8 cents per foot) and the other dated July 10, 1942 for $6 (advance on cutting).
These facts thus far detailed were either testified to or not controverted by defendant Donaldson or others of the defendants' witnesses.
Plaintiff's witnesses testified that on July 9th one of plaintiff's employees, George Hindersman, sent into the pasture of the north end of the Curlee farm to check on the horses, reported to Andrew Maschmeier, manager of plaintiff's farm, that a wire stock fence was cut and the horses were out in the oats field; that freshly cut trees were cut along the wire fence and stave bolts were hauled away. The next morning Maschmeier, Hindersman and another farm employee, Allen Welge, went to the place to repair the fence and inspect the cut trees. They saw "lots of fresh cut trees, tree tops, and fresh stumps, and some stave bolts, * * * evidence of skidding staves and hauling, evidence clearly marked on the ground." This was on the north end of the plaintiff's farm north of the gap in the cut fence and south of the Toedebusch fence separating the Curlee land from the Toedebusch land. Following the trail across the Curlee land onto the northwest corner of the Karrenbrock land, which lay to the east of the Curlee land, they came onto a parked ton and a half truck loaded with freshly cut staves. Following some tracks they proceeded north 100 yards to the Toedebusch line, continued north across the Toedebusch land about 400 yards, where they encountered two men, two women, four horses, a wagon and an empty truck. The men were *751 skidding out timber and preparing to load the truck. On the way they crossed the northeast tip of plaintiff's land on which they observed an improvised horse corral consisting of barbed wire strung around some trees, freshly cut stumps inside the corral, with feed bins and a board nailed across a tree for a harness hanger. There had been no horse corral there three weeks previously. The building of a horse corral on plaintiff's land was done without the knowledge or consent of the plaintiff or his employees. Maschmeier had a conversation with these men, following which they quit skidding and hauling and left the premises. Returning on the trail a distance of some 2600 feet south of the loaded parked truck, according to the plat introduced in evidence, and while traversing a tract belonging to plaintiff and known as "the 21 acre tract" Maschmeier and his two men heard sounds of sawing and cuting, followed the sounds, and located two men whom they found sawing down a tree on the Curlee land. One of the men was Oscar Cross, a woodcutter employed by Bolz-Donaldson Company. Maschmeier asked them on whose land they were supposed to be cutting and Cross told them they were supposed to be cutting on the Toedebusch land and that they were cutting for Donaldson. Maschmeier informed them they were wrong, that they were cutting on the wrong property, that they were cutting on "Colonel Curlee's property" whereupon they said, "If that's the case we can't cut," picked up their tools and left. Cross testified that he was on the Toedebusch farm as far as he knew; that at the time Maschmeier stopped him he was on the property between the fence and the Toedebusch houseon the Toedebusch farm. No more timber was cut on the Toedebusch job after July 10, 1942. The men went to another job.
The timber in that vicinity was good sound white oak timber, the type most desirable for stave bolts. There were freshly cut stumps around the roadway and trail and some new tree tops laying around on the ground. Only white oak trees were cut on the Curlee property.
Within the next day or two defendant James W. Donaldson, one of his foremen, a Roy Hubbs, and Mr. Toedebusch appeared on the Curlee premises, had a conversation with Maschmeier, made an inspection and then left. There is a conflict in the testimony as to why they appeared, what was said and what happened thereafter.
Maschmeier's version is that on July 11th they appeared, Donaldson introduced himself and said, "My boys tell me they have been cutting some timber on the Curlee land," and stated that he would like to make an inventory of the cutting; that when the place was pointed out to him Donaldson said, "It looks like they have been cutting some trees on the wrong land" and that after further inspection and pointing out of property lines between the Toedebusch and Curlee farms, Donaldson said, "Roy, it looks like we have been cutting timber on the wrong land. Will you make an inspection of the damage done?" Hubbs indicated in the affirmative and said he could do so the following Monday. Maschmeier testified that although they had a date set he did not see Hubbs thereafter.
Donaldson's version is that he received a telephone call from someone who identified himself as caretaker of the Curlee farm stating the timber was being cut from the Toedebusch line. Thinking that his men might be doing the cutting, he proceeded with his mill foreman, Roy Hubbs, and Toedebusch to the property; that Maschmeier pointed out where the timber had been cut; that he saw four of the woodcutters on the ground, questioned them, and that they denied they had cut the timber. In his deposition he stated that his men had told him that someone was cutting on Curlee's propertyothers than defendants' employees. He also said there were two men with a truck hauling stave bolts from where two or three of Curlee's trees had been cut. Arrangements were made for a meeting the next day with Maschmeier: Donaldson and Hubbs were to meet with him "to go over the situation; have a little court there on the hill." Donaldson couldn't make the appointment the next day, Hubbs appeared at the appointed time *752 and place, waited three or four hours, but Maschmeier did not keep the appointment and they never met again.
Plaintiff introduced in evidence a note admittedly written by Roy Hubbs as follows:
"Jan. 23, 1934 "I was out to see you about timber that was cut over line and you were gone that afternoon I was supposed to meet you I got hot and had to go in You let me now when you want me to come and I be here Drop me card.
 "Bolz-Donaldson
 "By Roy Hubbs,
 "8600 Page,
 "St. Louis"
James W. Donaldson made no protest to Curlee or his former manager, Maschmeier, on account of Maschmeier having stopped the cutting, although he knew that Maschmeier had stopped his men.
The testimony indicated that the brand "BD" was marked on every stave bolt. This stood for Bolz-Donaldson, and was used as a branding iron and was placed on the bolts by the timber foreman after they were cut. Defendants' witnesses testified that the branding hammer was always in the possession of the defendants' foreman or grader. There were about 125 bolts lying on the ground in the area north of the pasture, and about 15 bolts on the 21-acre tract when the tour of inspection was made. They were left there and none of them had been moved to the day of trial except two brought into court as exhibits. Ten days before the trial the brand mark "BD" was seen by plaintiff's witness, Victor Krafft, on most of the stave bolts lying on the ground. The record, however, disclosed no direct evidence of the time when these brands were applied.
Krafft, using the figures Maschmeier compiled from actual measurements of the bolts, tree stumps and tops, computed that the 2529 board feet cut were worth $756.90 at 30 cents per foot.
There was further evidence that two cutting crews could cut 150 feet of bolts per day.
Toedebusch, Donaldson and Cross all testified that they knew of no one else who was conducting timber operations in 1942 in that area other than defendants.
The stave bolts that came from St. Charles County in 1942 were made into staves and sold to Chess & Wymond of Louisville, Kentucky, holders of a mortgage on the Bolz-Donaldson mill, for which Bolz-Donaldson received credit on the mortgage debt.
This review clearly indicates that there was direct evidence of trespassing, circumstantial evidence of trespassing, and admissions of cutting across the line on plaintiff's property, constituting ample evidence from which the trial court properly could find that a trespass occurred.
It has been held that the cutting of timber on another's land constitutes trespass allowing recovery of single damages, even though the timber was not knowingly cut, and was cut by mistake, and although it was not done at the instance and direction of defendants, or by their consent. Mishler Lumber Co. v. Craig, 112 Mo.App. 454, 87 S.W. 41.
The first question presented on this appeal is whether either or both of the defendants are liable for these trespasses. Defendants contend that there is insufficient evidence to hold either liable.
It is at once apparent that if the individual defendant is liable the corporation also is liable, for it is not controverted that the acts of James W. Donaldson, as general manager and principal officer of the corporation, were done in the scope and course, and pertained to the duties of, his employment. 19 C.J.S., Corporations, § 1285. In Meade v. Chicago, R. I. & P. Ry. Co., 68 Mo.App. 92, loc. cit. 100, the court said: "In trespass all are principals. Cooley on Torts, 533, 534; Cooper v. Johnson, 81 Mo. 483; Canifax v. Chapman, 7 Mo. 175. And in trespass principals, as well as agents, are joint trespassers and the principal is liable for the acts of the agent performed within the line of his duty, whether the particular act was or was not directly authorized. Humbser v. Scott, *753 5 Mo.App. 507 [597]; Dowell v. Taylor, 2 Mo.App. [329] 334; Murphy v. Wilson, 44 Mo. 313."
Our conclusion from the evidence in this case is that defendant James W. Donaldson is individually liable for the trespasses on the ground that he aided, abetted and encouraged their commission. It appears that he ordered and directed two crews of woodcutters and the necessary skidders and truckers to cut and haul timber from the Toedebusch tract. He was in complete charge and assumed the entire control of the timber operation, and although he was not on the tract until the cutting was completed, he designated a forest foreman to prevent encroachment, and delegated to him the responsibility of protecting adjoining tracts of timber, thus recognizing the duty owed third persons not to trespass upon their lands. He attempted to discharge that duty by sending the forest foreman out on the job, but only infrequently and for very limited periodsa total of only nine hours of supervision in approximately one month of operations. At the time when the need for exercising care to prevent trespassing was the greatest, that is, after most of the timber on the Toedebusch tract had been cut, the forest foreman quit working for the corporation, and was not replaced. It plainly may be inferred from the evidence that thereafter Donaldson suffered and permitted the cutting crews, the skidders and truckers to remain in the woods, and permitted them to continue cutting and hauling timber for a period of ten days or two weeks without any supervision whatever with reference to boundary lines and encroachment, all in complete disregard of plaintiff's property rights. These cutters were paid by the number of feet of timber they cut; the more they cut the more they were paid. Defendant Donaldson thus placed them in a position where they could, and unless carefully supervised likely would, encroach and trespass upon adjoining lands and cut timber.
There was evidence from which the trial court might have found that the timber cut from plaintiff's land was cut after the time the crews were allowed to remain in the woods without supervision.
The rule is well established that "one who aids, abets, assists, or advises the trespasser in committing a trespass, is equally as liable as the one who does the act, himself." Cooper v. Massachusetts Bonding & Ins. Co., 239 Mo.App. 67, 186 S.W.2d 549, 551; Broyles v. Pioneer Cooperage Co., Mo.App., 208 S.W. 122; Sperry v. Hurd, 267 Mo. 628, 185 S.W. 170; Dyer v. Tyrrell, 142 Mo.App. 467, 471, 127 S.W. 114; Palmer v. Shenkel, 50 Mo.App. 571; McNeeley v. Hunton, 30 Mo. 332; Page v. Freeman, 19 Mo. 421; Wetzell v. Waters, 18 Mo. 396; Canifax v. Chapman, 7 Mo. 175.
In Holliday v. Jackson, 30 Mo.App. 263, loc. cit. 264, the court said: " * * * all who direct the commission of a trespass, or wrongfully contribute to its commission, * * * are equally liable to the injured person;" (italics ours), and this same language is repeated in Robinson v. Moark-Nemo Consolidated Mining Co., 178 Mo.App. 531, 163 S.W. 885.
"Aiding and abetting", like any other fact, may be proved by circumstantial evidence. Willi v. Lucas, 110 Mo. 219, 19 S.W. 726; Sperry v. Hurd, supra.
Liability for trespassing on the theory of aiding and abetting has been rigorously enforced, even in cases where defendant had nothing to do with the actual timber cutting operation.
In Dyer v. Tyrrell, supra, Tyrrell was held liable as an aider and abettor to a trespass involving timber cutting where he had nothing whatsoever to do with the operation, and where his only connection with the case was his signature to the contract for the purchase of timber, merely as a surety for the actual timber purchasers, and the fact that he sold supplies to the timber cutters, which supplies were paid for out of proceeds of the sale of the timber.
In Cooper v. Massachusetts Bonding & Ins. Co., supra, the surety on a contractor's bond was held liable in connection with a trespass committed by the contractor in doing certain street leveling work in front of plaintiff's property, on the theory that it had *754 abetted the trespass, the court saying, 186 S.W.2d loc. cit. 552: "Under such circumstances, it was for the court, sitting as a jury, to say whether defendant, in executing the bond, aided, abetted or assisted the contractor in committing the trespass."
In Broyles v. Pioneer Cooperage Co., supra, one Russell, the purchaser of certain timber, borrowed the money to pay for it from defendant and defendant furnished the machinery and mill with which to cut it into staves under an arrangement whereby all the staves produced were sold to defendant. During the unlawful cutting, defendant's representatives visited the mill to see whether they were making good staves and went over the timber to get an idea of what was on the land. Russell employed a foreman who was recommended by defendant. Russell (not defendant's employees) did the unlawful cutting. These facts were held to constitute sufficient evidence from which a jury might find that the defendant company was aiding and abetting Russell in trespassing and conversion.
In the case at bar the trial court, in his memorandum opinion, stated that " * * * James Donaldson conducted * * * the business of cutting and hauling in an indifferent, reckless and haphazard fashion, and in a manner which was likely to result in the people whom he employed * * * cutting and hauling beyond the boundary lines of their operations. He sent out men to purchase timber, he hired and procured cutters and haulers, he set everything into motion without taking the necessary precaution to follow up and see that they confined the cutting to the premises upon which they had procured timber rights, and to make sure they were not trespassing to the injury of others."
There was sufficient evidence to support these findings, and under the decided cases we hold that by placing his employees in this position, and thereafter failing to give them adequate supervision, under the circumstances, James W. Donaldson aided and abetted the commission of the trespasses, assisted in their occurrence, and is personally liable therefor.
It was not necessary that he personally participate in the commission of the trespass in order to be held liable therefor. Fette v. McCooey, Mo.App., 253 S.W. 392, 394.
The failure to prove by direct evidence the existence of actual knowledge on the part of Donaldson that these trespasses were occurring does not relieve Donaldson of liability. There was circumstantial evidence of knowledge on his part, including the statement, "I kept in touch with the progress of the work by periodic reports", and in any event, he had constructive knowledge of what was happening. It was his duty to inform himself with respect to the forces he had set in motion, particularly after the departure of his forest foreman. With his complete and "one-man" control of the company business, and easy access to the means of knowledge, Donaldson could and should have known of the trespasses. He is charged with the knowledge of that of which it was his duty to inform himself. He comes within the rule of acquiescence warranting an inference of consent, as stated in Fletcher's Encyclopedia on Corporations, Vol. 3, Section 1135, p. 708: "* * * corporate officers, charged in law with affirmative official responsibility in the management and control of the corporate business, cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, * * * with such acquiescence on their part as warrants inferring * * * consent or approval."
The trial judge, therefore, was justified under the evidence in finding the issues for plaintiff and against both defendants for single damages.
Defendants contend that the court below was not warranted in assessing treble damages; that if a trespass was committed it was innocently and mistakenly done, and not wilfully, maliciously, or attended by circumstances of bad faith or intentional wrong. The statute authorizing the imposition of treble damages, Section 3681, R.S.Mo.1939, Mo.R.S.A. § 3681, in so *755 far as applicable to this case provides: "If any person shall cut down, * * * or carry away * * * any timber, * * * growing on the land of any other person, * * * in which he has no interest or right, * * * the person so offending shall pay to the party injured treble the value of the things so * * * carried away, with costs."
The statute does not in terms require the act to be wilful, malicious, or attended by circumstances of bad faith. The act of cutting and taking is not characterized by the statute. Its arbitrary provision of liability is relieved only by the exculpatory provisions of Section 3684, which reduce the recovery to single damages "if it shall appear that the defendant had probable cause to believe that the land on which the trespass is alleged to have been committed, or that the thing so taken, carried away, injured or destroyed, was his own".
The burden was on the defendants, if they would escape the heavy hand of the statute, to show probable cause to believe that they had a right to cut the timber on plaintiff's land. Sample v. Reinhard, Mo. App., 253 S.W. 180; Chilton v. Missouri Lumber & Mining Co., 144 Mo.App. 315, 127 S.W. 941; Henry v. Lowe, 73 Mo. 96; Wood v. St. Louis, K. C. & N. Ry. Co., 58 Mo. 109; Walther v. Warner, 26 Mo. 143.
The presumption is that defendants knew the nature of their acts, and the "probable cause" which confines the recovery to single damages depends upon the honest and reasonable belief of defendants. Chilton v. Missouri Lumber & Mining Co., supra.
In this case there was evidence that a rail and wire fence divided the lands of Toedebusch and Curlee; that the fence had been pointed out to defendant's cutters at the commencement of the operation as the line; that they knew where the line was; that the employees of defendants built and used a horse corral on plaintiff's property without his consent; that when found, Cross and the other sawer (employees of defendants) were sawing a tree on plaintiff's property at a place more than one-half mile south of this known boundary lineapproximately 2900 feet over onto plaintiff's land, according to the plat. This is strong evidence of wanton misconduct. In Sligo Furnace Co. v. Hobart-Lee Tie Co., 153 Mo. App. 442, 134 S.W. 585, loc. cit. 587, the court said: "As to the timber cut on land in section 8, it is sufficient to say that the evidence shows that defendant bought the timber on 15 acres adjoining this land, and in cutting the timber from the 15 acres the agents of defendant got over the line a half mile. This is the only evidence bearing on the question of good faith as to the timber cut in section 8, and it, instead of showing good faith, shows a wanton disregard of plaintiff's rights. We find nothing in this record from which a finding that defendant's agents acted in good faith can be sustained." (Italics ours.)
Defendants' employee Cross testified that he and his companion thought they were cutting on the Toedebusch tract and promptly quit work when their trespass was challenged. The trial court, whose duty it was to appraise and weigh the evidence, apparently rejected this testimony indicating that the cutting and trespassing was done in good faith, came to the conclusion that James W. Donaldson conducted the business of cutting and hauling "in an indifferent, reckless and haphazard manner", and that defendants had no probable cause to believe that the land and timber was their own. Considering the whole record we conclude that Donaldson and the company's subordinate employees had every reason to know that the company had no right whatever to cut where plaintiff's timber was felled. His careless and reckless indifference for the rights of adjoining landowners, a fact which permeates this record, convicts him, and his principal, as "reckless trespassers who would despoil the property of another." Sample v. Reinhard, supra.
Defendants assign as error the refusal of the trial court to permit defendants to amend their general denial before the case was finally submitted so as to plead the three year statute of limitations applicable to actions for treble damages. The petition was filed August 6, 1945. The parties went to trial on these issues on April 4, 1949. On April 6, 1949 the third and last *756 day of the trial, at 11:50 o'clock A. M., after the defendants had concluded their defense, they for the first time asked leave to amend their answer to set up the defense of limitations. This was three years and seven months after they had filed their original answers. It was plainly no abuse of discretion to refuse to allow the amendment at that late hour, especially in view of the fact that such an amendment has been held to constitute a substantial change in the defense. Murray v. DeLuxe Motor Stages of Illinois, Mo.App., 133 S.W.2d 1074; Hatton v. Sidman, Mo.App., 169 S.W.2d 91.
It is contended, however, that at the time they requested leave to amend their answer to plead the statute of limitations the issue on the question of probable cause for the allowance of treble damages was not before the court; that this issue arises only after a finding for plaintiff for single damages. What we have said with reference to the tardiness of the request applies with equal force here. No abuse of discretion is made to appear in this connection.
Defendants seek to avoid the rule that the statute of limitations must be pleaded or it is waived by asserting that this is a penal action; that in a suit for a penalty the plaintiff has no cause of action independent of the statute; that the statute of limitations as applicable to a penal action is not a statute of repose which merely cuts off the enforcement of the remedy, but is a statute which extinguishes the cause of action if suit is not brought within the period, i. e., no cause of action remains. Defendants conclude that, having called the attention of the trial court to the fact that on the face of the record the statute of limitations had run, their action was tantamount to an oral motion to dismiss, sufficient to preserve this defense, without pleading the statute of limitations.
It is true that our Supreme Court in Lewis v. Missouri Pac. R. Co., 324 Mo. 266, 23 S.W.2d 100, expressly held that where the applicable statute of limitations not only bars the remedy but also extinguishes the the cause of action if suit is not brought within the time limit, and where this appears from the petition and evidence, the defendant is entitled to the benefit of the statute without pleading it. That case involved the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., the limitations provisions of which have been construed by the Federal courts to relate not merely to the remedy but to the right itself.
In the case at bar, however, there is no statutory provision declaring that the right expires with the expiration of the time limit. No special statute of limitations appears in Section 3681, supra, or elsewhere in Article 2, Chapter 28, R.S.Mo.1939, Mo.R. S.A. The applicable statute of limitations is the general limitations Section 1015, R.S. Mo.1939, Mo.R.S.A. § 1015. In so far as applicable to this case, the two sections, 1012 and 1015, when read together, provide that "Civil actions * * * can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued: * * * Within three years: * * * an action upon a statute for a penalty or forfeiture, where the action is given to the party aggrieved
* * *."
In none of these sections, or elsewhere, is the right extinguished or declared a nullity after the three years have expired. Courts should "exercise restraint in declaring a construction that the very right itself is extinguished by the lapse of time unless such is the plain statutory intent." Douglas, P. J., in Wentz v. Price Candy Co., 352 Mo. 1, 175 S.W.2d 852, 854. Section 1015 is a statute of repose operating on the remedy only and not affecting the right. As such, it had to be pleaded or else the benefit to be derived from it was waived. Kopp v. Moffett, 237 Mo.App. 375, 167 S.W.2d 87.
Defendants contend that the face of the record showed that the statute of limitations had run against the claim for treble damages, and that the court therefore erred in entering judgment for treble damages. Under the law as it existed prior to the adoption of the Civil Code of Missouri a demurrer might have been interposed in this situation, Gibson v. Ransdell, Mo.Sup., 188 S.W.2d 35, and under the new practice a motion to dismiss for failure to state a claim on which relief may be granted *757 might have been filed at the proper time. This was not done, and it is enough to say that defendants, by failing to do so, waived the objection.
Finally, defendants claim that it was plaintiff's duty to mitigate his damages by salvaging the 140 stave bolts which were left lying on the ground after defendants ceased operations, and which remained undisturbed to the time of trial. The burden is on the party claiming the allowance to introduce evidence which shows the opportunity the injured party had to dispose of the property, and the reasonable net amount which he could have recovered after deducting necessary expenses incident to the salvaging operation. Defendants offered no evidence on these matters, and, therefore, cannot now be heard to complain of the failure of the trial court to take into consideration mitigation of damages.
Finding no error in this record the judgment is affirmed. It is so ordered.
ANDERSON, P. J., and McCULLEN, J., concur.