**Bob GROTHE, Plaintiff–Appellant,**

v.

**Joe HELTERBRAND, Etolia Dugan, Dugan & Helterbrand Co., Inc., Defendants–Respondents.**

**No. 20953.**

Missouri Court of Appeals, Southern District, Division Two.

June 16, 1997.

James D. McNabb, Marshfield, for plaintiff-appellant.

Stephen L. Shepard, Springfield, for defendants-respondents.

SHRUM, Judge.

This is a tort case where Bob Grothe (Plaintiff) alleges that Joe Helterbrand (Defendant), general manager and president of a defunct corporation, was individually liable for the corporation's conversion of Plaintiff's personal property. Plaintiff appeals from the trial court's grant of directed verdict, after close of Plaintiff's evidence, in favor of Defendant. We reverse and remand that part of the judgment favorable to Defendant.

In reviewing a directed verdict in favor of a defendant, appellate courts view the evidence and permissible inferences most favorable to the plaintiff, disregard contrary evidence and inferences, and decide whether plaintiff made a submissible case. *Head v. National Super Markets, Inc.*, 902 S.W.2d 305, 306[1] (Mo.App.1995). A directed verdict is drastic action. *Id.; Lacks v. R. Rowland & Co., Inc.*, 718 S.W.2d 513, 517 (Mo. App.1986). Accordingly, there is presumption for reversing the trial court's grant of a directed verdict unless the facts and any inferences therefrom are so strongly against the plaintiff as to leave no room for reasonable minds to differ as to the result. *Head*, 902 S.W.2d at 306[3].

Viewed in this light, the evidence was that Plaintiff started a recycling business in 1973. As part of his business, Plaintiff bought scrap litho film from numerous sources. He then resold the scrap materials to firms that processed the film and recovered silver therefrom.

Plaintiff first met Defendant in the early 1980's when he went to Marshfield, Missouri, to visit Dugan & Helterbrand Company, Inc. (Dugan and Helterbrand), a processor of the type film in which Plaintiff was dealing. Plaintiff's first visit, which lasted several hours, involved discussions with Defendant, Elaine Helterbrand (Elaine), Whitfield Dugan, and Etolia Dugan.[1] Plaintiff testified: "We talked about this scrap negatives and they were a processor and they gave me a tour of the plant. . . . [H]ow they processed that and put it in to a rough bar." In that initial meeting, Defendant and Elaine told Plaintiff that "they had a silver bank . . . that would hold that metal after they processed it and then I could sell it whenever I feel free to sell it. If . . . the market would go up . . . I could sell it or collect my silver, the actual physical silver."

After this first meeting, Plaintiff began delivering his scrap film to Dugan and Helterbrand for processing. At times, Plaintiff would opt to be paid for silver recovered from his film and at other times he would choose to store his silver in the "silver bank." Plaintiff testified that Defendant and Elaine suggested that he leave his silver in "the silver bank." Continuing, Plaintiff testified:

"Q. Were you told at times that you had silver physically present on the plant of [Dugan and Helterbrand] . . . in Marshfield?

. . . .

"A. I was told that there was silver there in Marshfield and . . . that it would be accessible at any time. . . .

. . . .

"Q. . . . Who was it that told you that you had silver there on the premises?

A. Joe [Helterbrand] and Elaine both."

On December 7, 1989, Plaintiff asked for his silver; "I wanted to get squared up." Plaintiff's request was prompted by the rumor that Defendant "was having financial troubles" and by Defendant's admission of "cash flow problems." In response, Defendant and Elaine delivered to Plaintiff ten 100–ounce "Inglehart" silver bars but failed to deliver the remaining silver claimed by Plaintiff to be in his account, specifically 6,565.16 ounces. Regarding this balance, Defendant told Plaintiff "they didn't have any more silver right there." After Plaintiff's repeated requests for his silver proved futile, he filed this suit.

Called by Plaintiff as an adverse witness, Defendant testified that Dugan and Helterbrand was a corporation created in 1980, whose stock was owned by Defendant, Elaine, Etolia Dugan and Whitfield Dugan. These same four persons were directors and officers. Throughout, Defendant was president of the corporation. He also appointed himself as general manager of the firm. By 1990, Dugan and Helterbrand was "in trouble." Its problems were caused by a depressed silver market and actions taken by the EPA which closed the plant for a year. On April 9, 1991, the corporation was "administratively dissolved."

At trial, Defendant admitted that over the years Plaintiff had left some of his silver with Dugan and Helterbrand and those transactions were listed on a "consignment account" kept by Defendant's wife. Defendant testified: "This consignment account was set up for [Plaintiff]. . . . [A]ctually, [Plaintiff's] the only one that I know of that actually used what he called the consignment account." Continuing, Defendant testified that Plaintiff "wanted to settle up [on December 7, 1989] and we couldn't." Defendant explained the absence of Plaintiff's silver thusly:

"Q. [to Defendant] What had become of the silver that Plaintiff had entrusted to you?

"A. It was absorbed in to the business.

---

1. Plaintiff did not name Elaine Helterbrand, Defendant's wife, as a party defendant; she had filed a chapter seven bankruptcy. Whitfield Dugan, Defendant's father-in-law, died before Plaintiff filed this suit. Etolia Dugan, wife of Whitfield, was named as a party defendant. However, Plaintiff has not appealed from the directed verdict in favor of Etolia.

"Q. Hadn't you told him earlier that the silver would be delivered to him when he requested it?

"A. Sure, probably did."

Nevertheless, Defendant testified that "[w]e didn't keep [Plaintiff's] little batch of silver in a corner. . . . It was a standard rule [at Dugan and Helterbrand] that any silver that was processed and ready for shipping would be shipped [within a week or so of processing]." Continuing, Defendant testified:

"Q. [to Defendant] And are you the person, as president, did you say, 'Ship this silver?'

"A. I would have said as president anytime silver is ready ship it to whoever we're selling to.

"Q. In each case where [Plaintiff] delivered the silver to you on consignment, you shipped it out as soon as it was practicable?

"A. Probably, yes. Should have been anyway."

At the close of Plaintiff's case, the trial court sustained Defendant's motion for a directed verdict.[2] This appeal followed.

■ Plaintiff's sole point on appeal maintains that the trial court erred in directing a verdict in favor of Defendant because Plaintiff made a submissible case on the issue of Defendant's knowledge and participation in the corporation's conversion of Plaintiff's silver. We agree.

■ In Missouri, merely holding a corporate office will not subject one to personal liability for the misdeeds of the corporation. *Boyd v. Wimes,* 664 S.W.2d 596, 598[1] (Mo. App.1984). However, "corporate officers may be held individually liable for tortious corporate conduct if they have actual or constructive knowledge of, and participated in, an actionable wrong." *Lynch v. Blanke Baer & Bowey Krimko, Inc.,* 901 S.W.2d 147, 153[15] (Mo.App.1995); *Boyd,* 664 S.W.2d at 598[1]; *Osterberger v. Hites Constr. Co.,* 599 S.W.2d 221, 229[20] (Mo.App.1980).

"As pointed out in *Rauch v. Brunswig,* 155 Mo.App. 367, 137 S.W. 67 (1911), were the rule to the contrary, 'the agent of a corporation could shield himself from liability for almost every kind of wrong, provided he was acting in the capacity of agent . . . [T]he agent is liable to a third party for misfeasance and for acts of positive wrong.' 137 S.W. at 68."

*Boyd,* 664 S.W.2d at 598.

Here, Defendant was president and self-appointed general manager of the corporation during all of the time that Plaintiff did business with the company. Defendant actively participated in the initial discussions during which Plaintiff was told about the "silver bank" option. Plaintiff testified as he began using Dugan and Helterbrand's "silver bank," Defendant assured Plaintiff that the silver he consigned to that firm was physically present at the plant in Marshfield and "would be accessible at any time." Defendant admitted knowing of Plaintiff's consignment account with the corporation and admitted telling Plaintiff that his consigned silver would be delivered to him upon request. From such evidence, a jury could have reasonably inferred that Defendant was aware that the corporation was being entrusted to hold Plaintiff's consigned silver and not sell it. However, Defendant was also fully aware that the corporation never retained or kept Plaintiff's consigned silver on its premises. As Defendant stated, the policy at Dugan and Helterbrand was that all silver processed at that firm, including that listed on Plaintiff's consignment account, was to be sold within a week or so of processing. As to his participation in these sales, Defendant testified: "I would have said as president[,] anytime silver is ready[,] ship it to whoever we're selling to." From such evidence a jury could have reasonably inferred that Defendant participated in the misappropriation of Plaintiff's silver by directing that it be sold.

Contrary to Defendant's argument, Plaintiff was not required to prove that Defendant personally participated in the sale of each

**2.** The case was submitted to the jury as against the dissolved corporation. The jury returned a verdict for Plaintiff and against Dugan and Hel-terbrand for actual damages, $60,997.75, and for punitive damages, $15,000.

ounce of Plaintiff's silver to be held liable for its misappropriation. *See Curlee v. Donaldson*, 233 S.W.2d 746 (Mo.App.1950). In *Curlee*, a landowner in possession of certain timber land sought damages from a corporate defendant for trespass, specifically cutting and carrying away timber. The landowner named James Donaldson, president, treasurer, and general manager of the corporation, as co-defendant. Donaldson testified that he was "generally familiar" with the work of the company and had control over the timber cutters. Nevertheless, Donaldson did not personally tell the woodcutters where to cut and when to go to the woods; he had forest foremen take the men to a certain job; the foreman would do so, leaving them "as a rule" in the woods to cut, after giving them their orders. *Id.* at 749. Donaldson testified, "I wasn't the main one in the woods; I never went to the woods." *Id.* On appeal, the *Curlee* court noted that "all who direct the commission of a trespass, or wrongfully contribute to its commission are equally liable to the injured person." *Id.* at 753. The court then concluded that Donaldson was individually liable for the trespasses on the basis that he "aided and abetted and encouraged their commission." *Id.* at 753. "It was not necessary that he [Donaldson] personally participate in the commission of the trespass in order to be held liable therefor." *Id.* at 754[9].

Although *Curlee* is a trespass action, we deem it apropos to our analysis of this case. Trespass and conversion are tort claims and both are concerned with possession, not title. *See Lacks*, 718 S.W.2d at 517[2]; *Brown v. Wilkinson*, 495 S.W.2d 678, 680[1] (Mo.App. 1973). Here, there was sufficient evidence from which a jury could have reasonably inferred that Defendant directed the misappropriation of Plaintiff's silver or wrongfully contributed to its misappropriation. Defendant admitted that he knew Plaintiff had entrusted the corporation to hold some of his silver and that Defendant himself had told Plaintiff his silver would be delivered upon request; yet, Defendant also acknowledged his participation in the corporation decision to promptly sell all silver once it was processed. The foregoing, standing alone, provided sufficient evidence from which a jury could have reasonably inferred that Defendant aided and abetted the conversions of Plaintiff's silver and assisted in their occurrence. Thus, the jury could then have found Defendant personally liable therefor.

Finally, we note that Plaintiff was not required to prove the specific channels through which his silver traveled nor did he have to prove that Defendant benefited personally from the sale of Plaintiff's silver. *See Boyd*, 664 S.W.2d at 598. This follows because "the essence of the tort of conversion lies not in the wrongful acquisition by the wrongdoer but rather in misappropriation by the holder." *Id.* at 598[3].

Viewing the evidence and permissible inferences most favorable to Plaintiff and disregarding all contrary evidence and inferences, *Head*, 902 S.W.2d at 306[1], there existed sufficient evidence of Defendant's knowledge and participation in the misappropriation of Plaintiff's silver to base a finding of personal liability against Defendant. Accordingly, that part of the judgment favorable to Defendant is reversed and the cause is remanded. We affirm the unappealed portions of the judgment, specifically the judgment for Etolia Dugan and Plaintiff's judgment against Dugan & Helterbrand Co., Inc.

CROW, P.J., and PARRISH, J., concur.